## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MADONNA BUSTILLOS, FRANCISCO
CONTRERAS, CONCEPCION T.
HERNANDEZ, MARTHA S. JIMENEZ and
AMANDA VOGELSANG-WOLF, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

vs.                                                                 No. CIV 13-0971 JB/GBW

BOARD OF COUNTY COMMISSIONERS OF
HIDALGO COUNTY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Conditional

Certification of a Collective Action Under 29 U.S.C. § 216(b) and Certification of a Class Action

Under Fed. R. Civ. P. 23(b)(3) and Memorandum in Support, filed September 30, 2014 (Doc. 33)

("Motion").   The Court held a hearing on November 21, 2014.   The primary issues are:

(i) whether to conditionally certify this case as a collective action under 29 U.S.C. § 216(b); and

(ii) whether to certify this case as a class action under rule 23(b)(3) of the Federal Rules of Civil

Procedure.   As to the first issue, because the Plaintiffs have pled facts that suggest that the

proposed class is similarly situated with regard to the alleged violations of the federal Fair Labor

Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA"), the Court will conditionally certify the

case as a collective action.   As to the second issue, because the Plaintiffs have not yet put forth

facts showing the proposed class' compliance with rules 23(a) and 23(b)(3), the Court will deny

the request for class certification without prejudice to allow them to renew it later, when and if

they can support the motion with evidence.  The Court thus grants the Motion in part and denies it in part.

## FACTUAL BACKGROUND

The Plaintiffs and proposed class members are correctional officers, sergeants, and lieutenants at the Hidalgo County Detention Center, and emergency dispatchers at the New Mexico Hidalgo County Central Emergency Dispatch Center.  See Complaint for Violations of the Fair Labor Standards Act, State Wage and Hour Laws, Breach of Contract and Unjust Enrichment Collective Action Complaint (29 U.S.C. § 216(b)) ¶ 1, at 1-2, filed October 8, 2013 (Doc. 1)("Complaint"); id. ¶¶ 8-10, at 2-3.  The gist of the Plaintiffs' Complaint is that all employees work, and are paid on the basis of, pre-assigned shifts, but (i) they are not allowed to leave until another employee relieves them; and (ii) they are required to do various clerical tasks after the end of their shift, such as "reconcil[ing] call logs."  Complaint ¶ 10, at 3.  The Plaintiffs "are scheduled and paid only for the stated length of their shift," and, despite that they "are consistently required to work longer than the time allotted for their scheduled shift," they "are not compensated for this extra work time."  Complaint ¶ 12, at 3.  This practice resulted not only in the Plaintiffs losing regular -- i.e., non-overtime -- pay for the work done after the end of their shifts, but, in many cases, resulted in Plaintiffs and proposed class members, whom should be paid overtime wages -- i.e., one and one-half times the regular wage -- losing out on that pay, as well.  See Complaint ¶ 14, at 3.  Last, the Plaintiffs are also often required to be "on-call" for certain periods of time when they are not physically at work, and they receive no compensation for this time.  Complaint ¶ 15, at 4.

## PROCEDURAL BACKGROUND

The Plaintiffs filed suit in federal court on October 8, 2013.  See Complaint at 1.  They allege four causes of action: (i) violation of the New Mexico state wage and hour laws, N.M. Stat. Ann. § 50-4-1 to -30 ("NMSA"), Complaint ¶¶ 20-22, at 4; (ii) violations of the FLSA, see Complaint ¶¶ 23-27, at 4-5; (iii) breach of their employment contracts, see Complaint ¶¶ 28-31, at 5; and (iv) unjust enrichment, in the form of free hours worked, see Complaint ¶¶ 32-36, at 5-6.  The Plaintiffs demand a jury trial, see Complaint ¶ 37, at 6, and ask that the case proceed as a "collective action" under 29 U.S.C. § 216(b) and that they receive compensatory and liquidated damages, including pre- and post-judgment interest, and costs and attorneys' fees, see Complaint ¶¶ a-f, at 6.

Hidalgo County answered the Complaint within one month.  See Defendant's Answer to Plaintiff's Complaint for Violations of the Fair Labor Standards Act, Stage Wage and Hour Laws, Breach of Contract and Unjust Enrichment Collective Action Complaint (29 U.S.C. § 216(b)), filed November 7, 2013 (Doc. 5)("Answer").  It admits that all of the Plaintiffs and the proposed class members -- both the detention-center employees and the emergency dispatchers -- are not allowed to leave their posts until relieved by the incoming employee for the next shift, see Answer ¶¶ 9, 11, at 3, but it denies that the dispatchers are required to reconcile call logs after the end of their shift, see Answer ¶ 10, at 3.  Hidalgo County contends that, in fact, the dispatchers "are required to reconcile call logs at the end of each call."  Answer ¶ 10, at 3.  It "admits Plaintiffs are scheduled and paid for the length of their shifts for time actually worked by each employee," but it "denies the . . . allegations" that the Plaintiffs are required to work beyond their scheduled shift.  Answer ¶ 12, at 3.  It also categorically denies the Plaintiffs' claims of

going unpaid for on-call time, asserting that "only detectives and corporals are on call."  Answer

¶ 15, at 4.

The Plaintiffs filed the Motion on September 30, 2014.  See Motion at 1.  They request

that the Court "conditionally" certify Count II, the FLSA claim, as a collective action under 29

U.S.C. § 216(b), and that the Court certify the other three claims as a class action under rule

23(b)(3).  Motion at 7.  See Motion at 3.  They define their proposed class action and their

proposed collective action in identical terms.  See Motion at 3.  They define the class by way of

two subclasses -- the union of which the Court presumes to be the class definition:

> [SUB]CLASS 1:  All current and former employees of Hidalgo County employed
> at the Hidalgo County Detention Center within the past three years as a Detention
> Officer who have, at any time in the relevant period, worked at a post that
> required pre- or post-shift briefing, and work related to on-coming or out-going
> employees in that post, or who worked "on call" shifts.
>
> [SUB]CLASS 2:  All current and former employees of Hidalgo County employed
> at the Hidalgo County Dispatch Center within the past three years as a Dispatch
> Operator who have, at any time in the relevant period, worked at a post that
> required pre- or post-shift briefing, and work related to on-coming or out-going
> employees in that post, or who worked "on call" shifts.

Motion at 3-4.

The Plaintiffs describe significant facts in their Motion that they did not plead in their

Complaint:

> Plaintiffs represent two distinct subclasses of employees. The first set of
> Plaintiffs, and other similarly situated employees, fill certain "posts" at the
> Detention Center and rotate on one of three shifts -- day, night, and graveyard.
> (At previous times, Detention Officers have worked on 12-hour shifts.)
> Defendant has had a policy and practice of requiring these employees to arrive at
> least five minutes prior to their scheduled shift to perform work and receive a pre-
> shift briefing.  Employees were not compensated for this time, much of which
> was performed at overtime rates.  Through this practice, for virtually every shift
> on every "post," employees' work schedules overlap for up to five to fifteen
> minutes, yet Defendant compensates only one of the two employees for this time.
> In addition, Detention Center employees at times are expected to be "on call,"
> requiring them to remain close to the facility and available by phone at all times.

Employees were not compensated for this time, even when they responded to Detention Center inquiries and emergencies by phone, helping resolve work issues that arise.

A similar policy is in place in the Dispatch Center, where written policies require all operators to arrive at least five minutes prior to their scheduled shift to perform work and receive a pre-shift briefing. Dispatch Operators rotate on one of three shifts -- day, night, and graveyard. (At previous times, Dispatch Operators have worked on 12-hour shifts.) These Dispatch Center employees also were not compensated for this time, much of which was performed at overtime rates. Dispatch employees also are expected to be "on call" at times, requiring them to remain close to the facility and available by phone at all times. Employees were not compensated for this time, even when they responded to Dispatch Center inquiries and emergencies by phone, helping resolve work issues that arise.

Motion at 2-3.

The Plaintiffs state that, "[w]ithin the sub-classes, Detention Officers perform largely the same duties, with Corporals considered lead employees who have administrative and oversight duties in addition to working the same shifts and performing the same duties as regular officers." Motion at 5. They assert that all "Detention Officers are required to be at their post assigned at the beginning of their shift," but that:

[B]efore arriving at that post, Detention Officers must (1) read post orders and sign a receipt slip indicating those post orders have been read; (2) inspect all equipment and report any discrepancies; and (3) attend a briefing in the control room that includes all out-going and in-coming Detention Officers in an overlap of their shifts.

Motion at 6. The Plaintiffs contend that this pre-shift briefing typically takes between five and fifteen minutes. See Motion at 6.

As for the dispatchers, the Plaintiffs assert that their "Policies and Procedure manual explicitly requires" that they report five minutes before each shift. Motion at 6. The Plaintiffs state that:

Before "logging on" to the system to take over the radio operations from the out-going Dispatch Operator -- thus officially relieving that out-going employee from duty," the dispatchers must go through the following pre-shift routine: (1) retrieve

- 5 -

a headset and notebook from a locker room; (2) sign in to radio logs; (3) log into the 911 and NCIC computer systems; (4) review the briefing board, pass-down logs and desk logs; (5) check incoming teletypes and NCIC files; and (6) conduct a verbal briefing with the out-going Dispatch employee.

Motion at 6-7.  They also assert that, after the end of their shift, the dispatchers must file their logs, log off their computer systems, clean their work stations, and conduct a briefing with the incoming dispatcher.  See Motion at 7.

In the Motion's legal section, the Plaintiffs first argue for conditional certification of the collective action.   See Motion at 7-14.   They argue that, under the FLSA, conditional certification -- which they contend to be the point at which notice giving an opportunity to opt-in is sent to prospective action members -- is appropriate whenever the proposed class members are "'similarly situated.'"   Motion at 9 (quoting 29 U.S.C. § 216(b)).   They contend that this standard is less stringent than those for class certification under rule 23, and "more elastic and less stringent" than the requirements for joinder under rule 20 and severance under rule 42. Motion at 9.  They contend that collective-action certification is done in stages: first, the Court opens a notice stage, in which it allows court-facilitated notice to employees other than the named plaintiffs; second, the Court determines whether the action may proceed to trial as a collective action; and third, the Court tries the action.  See Motion at 9-10.  The Plaintiffs in this motion seek only to enter the first stage, and they contend that their burden to secure notice is minimal: they must show only that all proposed collective-action members were subject to a single decision, policy, or plan.  See Motion at 10.

The Plaintiffs state that because discovery is conducted only after the Court conditionally certifies the collective action, their burden is low.  See Motion at 10.  They argue that a "'colorable basis' for the claim of similarity" suffices.  Motion at 10 (quoting Schwed v. Gen. Elec. Co., 159 F.R.D. 373, 375-76 (N.D.N.Y. 1995)(Hurd, J.)).  They contend that they can meet

their burden merely by showing that they "have the same employer, are subject to the same employer practices, and -- particularly relevant here -- suffer the same method of calculation of wages owed."  Motion at 10.  Last, they contend that the primary purpose of involving the Court in this stage of the proceedings is to allow the Court to oversee the notice process and ensure that the Plaintiffs' counsel's communications are ethical and accurate.  See Motion at 11-13.  They attach a proposed notice, see Notice of Your Right to Join Lawsuit Against Hidalgo County, filed September 30, 2014 (Doc. 33-9)("Proposed Notice"), which they say is modeled off the notice in Reab v. Elec. Arts, Inc., 214 F.R.D. 623, 627 (D. Colo. 2002)(Babcock, J.), see Motion at 13.

The Plaintiffs also ask the Court to certify the case as a class action.  See Motion at 14-23.  Although the Plaintiffs cite mostly federal case law, they primarily refer to the rule in question as "Rule 1-023," which is the New Mexico Rules of Civil Procedure's class-action rule.[1]  Motion at 14-23.  They assert that preliminary discovery indicates that there are likely to be about fifty class members, which they argue is sufficient to satisfy numerosity.  See Motion at 15.  They assert that the following three common issues satisfy the commonality and typicality requirements: (i) "whether Defendant has required the class members to perform pre-shift work, post-shift work, and on-call work without compensation, a question that will be answered by reference to Post Orders, Standard Operating Procedures, and Policies equally applicable to all members of the class"; (ii) whether such a practice, if established, unjustly enriches the employer by the value of that labor (calculated based on their hourly wage)"; and (iii) "whether Defendant thus breached the identical implied employment contracts with all class members."  Motion at

---

[1]The Plaintiffs also refer to rule 23 of the Federal Rule of Civil Procedure throughout the Motion.

17.  As to adequacy, the Plaintiffs contend both that there is no conflict among the class and that their counsel is "an experienced attorney who has litigated numerous class-action suits in state and federal court."  Motion at 18.

Hidalgo County responded to the Motion two weeks later.  See Defendant's Response to Plaintiffs' Motion for Conditional Certification of the Collective Action Under 29 U.S.C. § 216(b) and Certification of a Class Action Under Fed. R. Civ. P. 23(b)(3), filed October 14, 2014 (Doc. 35)("Response").  It first argues that, although "[t]he standard for certification at the initial notice stage is generally a lenient one," because a considerable amount of discovery has already been conducted in this case, the Court should "rigorous[ly] review and consider all the evidence gathered to date by the parties."  Response at 2-3.  It cites several cases that it asserts have taken this approach, but acknowledges that "federal district courts in the Tenth Circuit have generally declined to bypass the more lenient stage."  Response at 3.  Hidalgo County argues that despite other courts' refusal to apply a higher standard, the case law does not foreclose the standard it advances, and the standard would further judicial economy's interests, because it would cut off the possibility of sending out notices only to refuse certification at a later stage.  See Response at 4.

Hidalgo County also argues that, even if the Court applies the more lenient standard that the Plaintiffs recommend, certification is still improper.  See Response at 4-11.  It asserts that Plaintiff Vogelsang-Wolf worked as a detention officer from April, 2012, to July, 2014, and her typical shift was from 7:00 a.m. to 7:00 p.m.  See Response at 5.  Hidalgo County cites her deposition testimony, where she states that detention officers were not disciplined for failing to arrive earlier than their scheduled shifts.  See Response at 5 (citing Deposition of Amanda Vogelsang-Wolf at 11:79:1 (taken Aug. 19, 2014), filed October 14, 2014 (Doc. 35-1); id. at

11:80:1-6).  It also asserts that she was never denied overtime pay and was compensated for on-call time whenever she was called to come work, which occurred on fewer than ten occasions throughout her tenure with Hidalgo County.  See Response at 5-6.  Hidalgo County contrasts Vogelsang-Wolf with Jimenez, who worked as a dispatcher from September, 2005, to November, 2013, and who testified that, although dispatchers would show up slightly before their scheduled shifts, no dispatcher was ever disciplined or admonished for their failure to do so as far as she was aware.  See Response at 6.  Hidalgo County points out that Jimenez testified that she usually took five to ten minutes before every shift to do work-related activity, but that during her earlier years, she would regularly perform two and a half hours a week of off-the-clock work.  See Response at 7.

Hidalgo County argues that Vogelsang-Wolf's and Jimenez' depositions make clear that they had "different interpretations of the Defendant's policies and practices, thereby resulting in a lack of uniformity even among the nature and extent of their claims."  Response at 7.  It points out, specifically, that Vogelsang-Wolf never alleges that she was illegally deprived of overtime pay for her pre-shift and post-shift activities, but, rather, that her claims are based on her on-call time.  See Response at 7.  Jimenez' claims, on the other hand, are based primarily on pre-shift and post-shift work, which Hidalgo County contends makes Vogelsang-Wolf and Jimenez dissimilarly situated.  See Response at 8.  Hidalgo County also asserts that "both Plaintiffs acknowledge the distinctiveness of their claims from the other Plaintiffs and other potential class members," and that, "[i]n light of these inconsistencies, Plaintiffs' personal interpretations of Defendant's policies and procedures cannot reasonably be stretched so far as to infer that the potential opt-ins also interpreted these policies in the same way and acted in accordance therewith."  Response at 8.  Last, Hidalgo County argues that, contrary to the Plaintiffs'

assertions, there would be nothing unethical about the Plaintiffs' counsel contacting potential class members and talking to them; notice thus serves little purpose.  <u>See</u> Response at 10-11.

Hidalgo County also opposes class certification under rule 23. It argues that class certification is per se improper in this case, because the non-FLSA claims are "derivative of the FLSA claims asserted."  Response at 12.  It argues that the Plaintiffs' three state law claims cannot proceed, leaving the Plaintiffs with only FLSA claims.  These claims, Hidalgo County asserts, must be brought using the FLSA's collective action mechanism found in § 216(b) and not rule 23.  <u>See</u> Response at 12-14.  Hidalgo County argues that the cases upon which the Plaintiffs rely to show that class certification is proper involved independent state statutory claims and not merely catch-all claims like breach of contract and unjust enrichment.  <u>See</u> Response at 12.  Although Count I alleges NMSA violations, Hidalgo County argues that the provisions cited do not apply to it, because it is a public employer.  <u>See</u> Response at 12.  It states that Count III, the breach-of-contract claim, is likewise invalid, because "'an agreement to do what one is already legally bound to do is not sufficient consideration for the promise to another.'"  Response at 13 (quoting <u>Salazar v. City of Albuquerque</u>, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *46 (D.N.M. Aug. 20, 2013)(Browning, J.)).  It argues that Count IV, for unjust enrichment, is derivative of the FLSA claim, because Hidalgo County's enrichment is unjust only because of the alleged FLSA violations.  <u>See</u> Response at 13-14.  For these reasons, Hidalgo County argues that the Plaintiffs' state law claims cannot provide an independent basis for rule 23 class certification.

Hidalgo County further argues that, even if class certification is not per se improper -- <u>i.e.</u>, even if the Court does not conclude that the non-FLSA claims are duplicative to or derivative of the FLSA claim -- the Plaintiffs have still failed to carry their burden to "me[e]t the

rigorous requirements of Rule 23(a)."  Response at 14.  It first argues that the proposed class definitions are not sufficiently definite, because they would require the Court to make "individualized inquiries of whether the plaintiffs meet the definition."  Response at 16.  It contends that "some employees may have engaged in on-call work or shift-to-shift briefings during the past three years that never exceeded any overtime thresholds, and [they would be class members, but] they would not be entitled to overtime compensation under their claims."  Response at 16-17.  It also argues that the term "on-call" is too vague to serve as a reliable class-definition parameter, because federal Department of Labor regulations distinguish between "on-duty" and "off-duty" on-call hours.  Response at 17.  It asserts that this case does not satisfy the numerosity requirement, because the Plaintiffs have not shown that joinder of fifty individual parties would be impracticable.  See Response at 19.

Hidalgo County last argues that the proposed class representatives -- i.e., the named Plaintiffs -- are atypical and inadequate to serve their role.  See Response at 19-22.  It contends that the Plaintiffs' differing interpretations of the policies create an intra-class conflict, because they "have differing opinions about how their time should have been recorded."  Response at 21.  It states that, the Plaintiffs' might have to make their substantive case -- if Hidalgo County failed to keep reliable wage-and-hour records -- by giving estimates of their unpaid time.  See Response at 21-22.  According to Hidalgo County, the two Plaintiffs' need to present conflicting models of estimation to the jury reduces the odds that the jury will find in their favor, and, thus, the conflict prejudices their class.  See Response at 22.

The Plaintiffs replied to the Response two weeks later.  See Plaintiffs' Reply in Support of Their Motion for Conditional Certification of a Collective Action Under 29 U.S.C. § 216(b) and Certification of a Class Action Under Fed. R. Civ. P. 23(b)(3) and Memorandum in Support,

filed October 28, 2014 (Doc. 37)("Reply").  The Plaintiffs first note that -- although Hidalgo County requests a higher standard than the Plaintiffs suggest for certification, and it asserts that the proposed class is not similarly situated on other grounds -- Hidalgo County never contests that all proposed class members were subject to the same policies and operating procedures.  See Reply at 1-2.  They argue that this concession alone establishes that the Plaintiffs are similarly situated and that the Court should conditionally certify the collective action.  See Reply at 2.

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week.  See 29 U.S.C. §§ 206-207.  The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual rights of action in civil suits to recover unpaid minimum wages, overtime compensation and certain liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217.  "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

1.      **Employers Under the FLSA.**

The FLSA defines "employer" broadly:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203.   "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship."   Saavedra v. Lowe's Home Cntrs., Inc., 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010)(Browning, J.)(quoting Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961)).   The Supreme Court of the United States has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA. Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 326 (1992).   See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)("[T]here is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act . . . . The definition of 'employ' is broad.").   The Tenth Circuit has similarly recognized that "[t]he terms 'employ' and 'employer' are given . . . broad . . . definitions."   Johnson v. Unified Gov't of Wyandotte Cnty., 371 F.3d 723, 729 (10th Cir. 2004)(Holloway, J.).

> The statute is a remedial one, written in the broadest possible terms . . . . It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)(Timbers, J.).   Employer includes persons or entities that have "managerial responsibilities" which give the person or entity "substantial control of the terms and conditions of the work of [its] employees."   Falk v. Brennan, 414 U.S. 190, 195 (1973).   "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee

compensation, may be held personally liable under the FLSA." Saavedra v. Lowe's Home Centers, Inc., 748 F. Supp. 2d 1273, 1288 (citing Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)). See Fegley v. Higgins, 19 F.3d 1126, 1131 (6th Cir. 1994); Reich v. Circle C Inv. Inc., 998 F.2d 324, 329 (5th Cir. 1993); Donovan v. Grim Hotel Co., 747 F.2d 966, 972 (5th Cir. 1984); Donovan v. Janitorial Services, Inc., 672 F.2d 530, 531 (5th Cir. 1982); Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1300 (5th Cir. 1969).

### 2.    The FLSA's Minimum Wage, Overtime, and Records Requirements.

The FLSA's § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'" Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.). "Contractual stipulations as to the regular rate are not controlling, because the regular rate is an 'actual fact,' rather than 'an arbitrary label chosen by the parties.'" Chavez v. City of Albuquerque, 630 F.3d at 1305. The United States Court of Appeals for the Tenth Circuit has recognized "that a contract cannot designate an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate." Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work." 29 U.S.C. § 203(g).

- 14 -

See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.'  The act, however, contains no definition of 'work.'").  "'The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's.'"  United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(quoting Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)).  The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)).  As the Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.  Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

The FLSA's § 6 requires employers to pay their employees a minimum wage.  See 29 U.S.C. § 206(a).  Deductions from employees' paychecks, for whatever reason, that brings the employees' pay under the minimum wage violates § 6.  See Donovan v. Simmons Petrol. Corp., 725 F.2d at 84 (holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation).  Cf. Dole v. Solid

Waste Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(finding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA), aff'd, 897 F.2d 521 (3d Cir. 1990), and aff'd sub nom. Appeal of Solid Waste Servs., Inc., 897 F.2d 524 (3d Cir. 1990). Additionally, the FLSA's § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain.  29 U.S.C. § 211(c).  In Donovan v. Simmons Petroleum Corp., the Tenth Circuit recognized employers' duty under the FLSA to keep accurate records in discussing the shift between the employee and employer of the burden to prove damages:

> The employee bears the burden of proving he performed work for which he was not properly compensated.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).  However, employers have a duty to keep accurate records. If employers do not keep accurate records the employee's burden is extremely difficult.    In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in Anderson that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Id.  Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate.   The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law.  Id. at 687-88.

Donovan v. Simmons Petroleum Corp., 725 F.2d at 85-86.  The federal Department of Labor's Wage and Hour Division requires that employers must maintain in the records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the employee in any week in which overtime compensation is due, hours worked each workday and workweek, total daily or weekly straight-time earned, and total overtime.  See 29 C.F.R. § 516.2(a).  Where an employer violates its § 211(c) record-keeping duties, including by not

counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees.  See U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and postshift hours worked."); Metzler v. IBP, Inc., 127 F.3d 959, 965–66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ].").

The general rule for calculating overtime is set forth in § 7(a).  See 29 U.S.C. § 207(a)(1). Because the FLSA does not put a limit

> on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by [the FLSA] section 7(a).

29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  See 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is actually employed.").  The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he works in excess of forty in a given week.

One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest.  If not more than the maximum hours prescribed in the Act are actually worked in the workweek, overtime pursuant to section 7(a) need not be paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay overtime for those hours does not relieve an employer from paying overtime for them if the contract of employment demands them.  See 29 C.F.R. § 778.102.

For the purposes of calculating overtime under the FLSA, however, the only concern is whether the total hours worked in a given workweek are above or below the statutory requirement for overtime compensation.  See 29 C.F.R. § 778.102.  A second important principle about calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of no less than one and one-half times the "regular rate" for which the employer employs the employee.  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of [the FLSA's] Section 7(a) is the regular rate of compensation.").  The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. at 424.  Since the Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co., Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C. § 207(e) ("[T]he 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight

statutory exceptions),[2] and the interpretive bulletins have incorporated the Supreme Court's definition, see 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'").  Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part.  See 29 C.F.R. § 779.108.

3.      **The FLSA's Remedies.**

Actions to enforce the FLSA's overtime provisions are generally subject to a two-year statute of limitations unless the violation is willful, in which case the limitations period is three years.  A lawsuit to enforce a cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages,

> may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .

29 U.S.C. § 255(a).  Willful violations occur when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985)).

Beyond the actual damages to cover the amount of unpaid minimum wages or overtime compensation, the FLSA's § 16(c) allows additional recovery of "an equal amount of liquidated damages."  29 U.S.C. § 216(c).  The Tenth Circuit has noted: "The purpose for the award of

---

[2]To clarify, the FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated.  See Scott v. City of New York, 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)("The words 'regular rate' are not defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. at 40)(internal quotation marks omitted)).

liquidated damages is 'the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" Renfro v. City of Emporia, 948 F.2d 1529, 1540 (10th Cir. 1991)(quoting Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 463 (D.C. Cir. 1976)).  If the employer can show that the conduct giving rise to the action to recover back pay was in good faith, and that the employer had reasonable grounds to believe the conduct was lawful, the court may refuse to award some or all liquidated damages:

> Under 29 U.S.C. § 260, if in any action to recover unpaid overtime compensation an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA," the court may refuse to award liquidated damages.
>
> All circuits that have considered the matter hold that the trial court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act.

Renfro v. City of Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984)).  The employer bears the burden to prove that the conduct was reasonable and in good faith.  See Renfro v. City of Emporia, 948 F.2d at 1540.  For purposes of assessing whether the employer meets its burden, "[t]he good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the Act.  The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior.'"  Renfro v. City of Emporia, Kan., 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d at 725).  See Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273, 1295 (D. Kan. 2012)("While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable.  If the employer meets

that burden the court retains discretion whether to award liquidated damages."   (citations omitted)).

The FLSA's § 17 provides that district courts "shall have jurisdiction, for cause shown, to restrain [FLSA] violations . . . including . . . the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . . ."  29 U.S.C. § 217(c).  The question whether a court should grant an injunction is left to the court's sound discretion.  See Mitchell v. Hertzke, 234 F.2d 183, 187 (10th Cir. 1956) ("Although it is not clearly stated in these Labor Standards Act cases that the burden of proving the need for an injunction is upon the movant[,] that is a general principle of law and applies with legal force here.").   "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. Current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief."  Metzler v. IBP, Inc., 127 F.3d at 963 (alterations omitted)(citations omitted)(quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)); Brock v. Big Bear Market No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987).  In exercising its discretion to grant a prospective injunction after finding a previous FLSA violation, "courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith."  Metzler v. IBP, Inc., 127 F.3d at 963-64 (citing Martin v. Coventry Fire Dist., 981 F.2d 1358, 1362 (1st Cir. 1992)).

## LAW REGARDING CLASS ACTIONS

In deciding whether to certify an FLSA collective action or a rule 23 class action, the court does not decide the merits of the underlying claims or resolve factual disputes. See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1106-07 (10th Cir. 2001)(Briscoe, J.). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."   Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982)(Seth, J.)(quotation omitted).

### 1.   Rule 23.

Rule 23[3] sets forth the requirements for certifying a class action under the federal rules. See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all of rule 23(a)'s requirements; and (ii) one of the three sets of requirements under rule 23(b), which correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b).  The plaintiff bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978)(Barrett, J.); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.).  In ruling on a class certification motion, the court need not accept either party's representations, but must independently find the relevant facts to a preponderance of the evidence.[4]   See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir.

---

[3] Throughout their Motion, the Plaintiffs cite both to Fed. R. Civ. P. rule 23 and to NMA rule 1-023 on class actions.  The Court, as it must, considers the Motion under the Federal Rules of Civil Procedure.  See Murphy v. Gorman, 271 F.R.D. 296, 309 n.3 (D.N.M. 2010)(Browning, J.)("The court had federal question jurisdiction and thus applied the federal rules.").   See also West v. N.M. Taxation and Revenue Dep't, 2011 WL 5223010, at *5 (D.N.M. Sept. 30, 2011)(Browning, J.)("The local rules do not take precedence over the federal rules.").

[4] As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23

2000)(Tjoflat, J.)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d at 799.  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)(Baldock, J.)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [General

_____

motion: "The Court must accept a plaintiff's substantive allegations as true, but it 'need not blindly rely on conclusory allegations which parrot Rule 23,' and 'may consider the legal and factual issues presented by plaintiff's complaints.'"  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999)(Tacha, J.); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013)(Kelly, J.).  See Chieftain Royalty Co. v. XTO Energy, Inc., 528 Fed. App'x 938, 942 (10th Cir. 2013)(Kelly, J.)(remanding the case to the district court for "relaxing Chieftain's 'strict burden of proof'").  This directive is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008)(Parker, J.); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008)(Scirica, J.); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation that a court must adopt a plaintiff's substantive allegations -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

> Telephone Co. of the Southwest v.] Falcon, [457 U.S. 147 (1982)], that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.   The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011)(Scalia, J.).  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the merits of the case at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013)(Ginsburg, J.)(internal citation omitted).  To reconcile these two directives, the court will find facts for the purposes of class certification by a preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.  This approach is analogous to preliminary injunction practice, and, although the Tenth Circuit has not endorsed it, other circuits have.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013)(Wood, J.); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008)(Scirica, J.); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004)(Niemeyer, J.).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must

conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).

### a. Requirements Applicable to All Classes: Rule 23(a).

All classes must satisfy the prerequisites of rule 23(a):

**(a)** **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

 **(1)** the class is so numerous that joinder of all members is impracticable;

 **(2)** there are questions of law or fact common to the class;

 **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

 **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988)(Anderson, J.).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004)(Tymkovich, J.)(quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. at 161)(citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy.

### i. Numerosity.

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a

presumption."  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006)(Tymkovich, J.).  The

Tenth Circuit has stated that there is "no set formula" to determine whether the numerosity

requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion.

Rex v. Owens, 585 F.2d at 436.  See Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270,

275 (10th Cir. 1977)(Doyle, J.)("Impracticability is dependent not on any arbitrary limit but upon

the circumstances surrounding the case.").   What matters is whether joinder would be

impracticable, not whether the number of proposed class members would cross some threshold.

Because of the fact-specific nature of the inquiry, Tenth Circuit courts "grant wide latitude to the

district court in making this determination." Trevizo v. Adams, 455 F.3d at 1162.  For example,

in Johnson v. Gross, 125 F.R.D. 169 (W.D. Okla. 1989)(Alley, J.), the district court found that

the plaintiffs' proposed class of twenty-eight individuals did not satisfy rule 23(a)(1), stating:

> Plaintiffs have made no showing that joinder of these 28 individuals, or the
> personal representatives of those deceased, would be impracticable.  Indeed, more
> than that number of defendants have been joined in this very action.  Potential
> classes of much larger numbers have been denied class certification for failure to
> satisfy Rule 23(a)(1).  See, e.g., In re: Wheat Farmers Antitrust Class Action
> Litigation, No. 129 (J.P.M.D.L. June 25, 1979), aff'd. sub nom. Zinser v.
> Continental Grain Co., 660 F.2d 754 (10th Cir. 1981)(approximately 366 class
> members located in three states); Bennett v. United States, 266 F.Supp. 627, 629
> (W.D.Okla.1965)(potential class of "all residents and property owners in
> metropolitan Oklahoma City" held to be "not so numerous as to require a class
> action").  The Court finds that it would not be impracticable to join all potential
> class members as plaintiffs in this action, and therefore the requirement of Rule
> 23(a)(1) is not satisfied.

Johnson v. Gross, 125 F.R.D. at 171. The Tenth Circuit affirmed the district court's holding that

a class of twenty-eight members was too small to meet rule 23(a)(1)'s numerosity requirement.

See Johnson v. Thompson, 971 F.2d 1487, 1498 (10th Cir. 1992)(Ebel, J.)("Given our deferential

standard of review, we cannot say that the court's decision was in error.").  In Trevizo v. Adams,

the Tenth Circuit affirmed the district court's finding that, "although the number of putative class

members—eighty-four—was not insignificant, it was not such an overwhelmingly large number as to be prohibitive of joinder." 455 F.3d at 1162.

In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(citation omitted). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(Ryan, J.)(noting that rule 23(a)(1) is not a "strict numerical test," but holding that where a class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)(Peckham, J.)("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable."). "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993)(Kane, J.). See Robidoux v. Celani, 987 F.2d at 935 ("Impracticable does not mean impossible.").

In Gonzales v. City of Albuquerque, the Court denied a motion for class certification on the grounds that the plaintiffs had not shown that joinder would not be impracticable. 2010 WL 4053947, at *17 (D.N.M. Aug. 21, 2010)(Browning, J.). The Court did not deny certification on the basis of numbers alone, however. On the contrary, the Court stated that a proposed class of twenty-seven people could potentially satisfy the numerosity requirement in some circumstances. Gonzales v. City of Albuquerque, 2010 WL 4053947, at *17. The Court found that the plaintiffs could not show that joining the proposed class members would be impracticable. Moreover, the plaintiff admitted that "if the class were comprised of only the twenty-seven terminated

employees, it would not be worth conducting the case as a class action."  Gonzales v. City of Albuquerque, 2010 WL 4053947, at *17.

### ii.        Commonality.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual class members should not result in a denial of class certification where common questions of law exist."  In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)(Logan, J.)("That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'")(citations omitted).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2551.

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart Stores, Inc. v. Dukes, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2550-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 131 S. Ct. at 2547.  Wal-Mart, however, had no

centralized company-wide hiring or promotion policy, instead opting to leave personnel matters

to the individual store managers' discretion.  See 131 S. Ct. at 2547-48.  The plaintiffs argued

that, although no discriminatory formal policy applied to all proposed class members, "a strong

and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously,

the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby

making every [proposed class member] the victim of one common discriminatory practice."  131

S. Ct. at 2548.  The Supreme Court disagreed that such a theory constitutes a common question

under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2).  That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364.  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2550-51 (emphasis in original)(quoting Nagareda,

Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. REV. 97, 131-132 (2009)).

In Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.),

each plaintiff's claim was based upon the defendants' actions in collecting the fees from the

plaintiffs and not upon the plaintiffs' acts.   The district court found that each class member's

claim was therefore common to the entire class.   "[T]he Plaintiffs allege[d] that the entire class

was subjected to the same unconstitutional practices, which is sufficient to meet the commonality

requirement."   Harrington v. City of Albuquerque, 222 F.R.D. at 510.

### iii.        Typicality.

Rule 23(a)(3) requires that the named representative's claims be typical of the class'

claims.   See Fed R. Civ. P. 23(a)(3).   The typicality requirement ensures that absent class

members are adequately represented by evaluating whether the named plaintiff's interests are

sufficiently aligned with the class' interests.   See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48,

57 (3d Cir. 1994)(Becker, J.).   The Supreme Court has noted that "[t]he commonality and

typicality requirements of Rule 23(a) tend to merge."   Gen. Tel. Co. of the Sw. v. Falcon, 457

U.S. at 157 n.13.   "Provided the claims of Named Plaintiffs and class members are based on the

same legal or remedial theory, differing fact situations of the class members do not defeat

typicality."   DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(Baldock, J.)(citing

Adamson v. Bowen, 855 F.2d at 676).   "[L]ike commonality, typicality exists where . . . all class

members are at risk of being subjected to the same harmful practices, regardless of any class

member's individual circumstances."   DG v. Devaughn, 594 F.3d at 1199.   Factual differences

among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the

claims of the class representative and class members are based on the same legal or remedial

theory." Adamson v. Bowen, 855 F.2d at 676.  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181,

1189 (10th Cir. 1975)(Doyle, J.)("It is to be recognized that there may be varying fact situations

among individual members of the class and this is all right so long as the claims of the plaintiffs

and the other class members are based on the same legal or remedial theory.").  Accordingly,

differences in the amount of damages will not defeat typicality.  See Harrington v. City of

Albuquerque, 222 F.R.D. at 511.  "The United States Court of Appeals for the Tenth Circuit has

said that the typicality requirement is satisfied if there are common questions of law or fact."

Gianzero v. Wal–Mart Stores Inc., 2010 WL 1258071, at *3 (D. Colo. March 29,

2010)(Blackburn, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir.

1982)(McWilliams, J.)("In determining whether the typicality and commonality requirements

have been fulfilled, either common questions of law or fact presented by the class will be

deemed sufficient.")), cert. denied, 460 U.S. 1069 (1983);  Adamson v. Bowen, 855 F.2d at 676

("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so

long as the claims of the class representative and class members are based on the same legal or

remedial theory.")(citations omitted).

<strong>iv.       Adequacy.</strong>

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the

interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due-process

interests of unnamed class members, who are bound by any judgment in the action.  See

Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(Stevens, J.)(characterizing

adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d

1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the

competent representation requirement because class members are bound by the judgment (unless

they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)(Gourley, J.)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy-of-representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002)(Anderson, J.). In considering this second question, the attorney's experience and competence may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). Courts have found that intraclass conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 (5th Cir. 2007)(Jones, J.)(holding that the district court erred in certifying a class without evaluating intraclass conflicts). See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(Barkett, J.)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other class members benefitted"); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir.

1998)(Wilkinson, J.)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose interest was only in the maximization of damages);  Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(Michael, J.)(holding that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."  7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1768, at 389-93 (3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit."  Lowery v. City of Albuquerque, 273 F.R.D. 668, 680 (D.N.M. 2011)(Browning, J.)(citation omitted).

### b.   Different Categories of Classes Under Rule 23(b).

Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)."  Adamson v. Bowen, 855 F.2d at 675.  See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a

class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)**     **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
>> **(1)**     prosecuting separate actions by or against individual putative class members would create a risk of:
>>
>>> **(A)**     inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
>>>
>>> **(B)**     adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>>
>> **(2)**     the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>>
>> **(3)**     the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>>
>>> **(A)**     the putative class members' interests in individually controlling the prosecution or defense of separate actions;
>>>
>>> **(B)**     the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

> **(C)**  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)**  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, 2010 WL 4053947, at *11 (citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(Hartz, J.)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)–(D).  These four factors are not generally considered separately, but rather are analyzed at the level of two requirements -- both of which must be satisfied: predominance and superiority.  The four factors in (b)(3)(A) through (b)(3)(D) are all probative of both requirements.

### i.  The Superiority Requirement.

The first requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other

available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.  The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.  First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation.  These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)(Cudahy, J.)).  The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorney, devote time and energy to their own discovery, and testify on their own behalf.  The second way in which superiority can be achieved by rendering the usual procedural forms impractical is when there is such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.  While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass aggregation form, such as multidistrict litigation, might be better suited to the task.

In addressing whether a proposed class action is superior, courts must start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.  See Fed.

R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria.").    The first factor, "the class members' interests in individually controlling the prosecution . . . of separate actions," closely tracks the money value of the individual cases.  Fed. R. Civ. P. 23(b)(3)(A).  When individual actions are practical, they are preferred; the United States has a "deep-rooted historic tradition that everyone should have his own day in court," and adjudicating individual disputes is the core activity of our judicial scheme.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright et al., Federal Practice  Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).    The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013)(Cole, J.); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003)(Duggan, J.).

Another recurring issue that arises in relation to this factor is when the statute sued under provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions, or by granting statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages.  See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000 and class action damages at $500,000); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages at $5,000 and class action damages at $500,000).  Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates

another factor the court should consider: the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.  See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(Dimitrouleas, J.)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").  As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case.  Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior.

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, J.)(internal citation and quotation marks omitted).  See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)(Davis, J.)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," is closely linked to the first factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.  In this connection the court should inform itself of any litigation actually pending by or against the individuals."  Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).  This passage suggests that the extent to which proposed class members have already filed individual claims is probative evidence of the extent to which they will continue to file

individual claims in the event of certification denial, and indicates a higher "interest[] in individually controlling the prosecution."  Fed. R. Civ. P. 23(b)(3)(A).  It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B).  The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed

relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun." Fed. R. Civ. P. 23(b)(3)(B). The Court interprets this language to mean that it must look at what procedural forms the proposed class members' cases have taken. For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania. See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Penn.)(Robreno, J.). Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[5] See Rubenstein, Newberg on Class Actions § 4:70 (5th ed.)("[I]f a *class action* case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture.")(emphasis in original). Subsequent proposed classes should either be

---

[5]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the federal court system. It is less clear how to handle a putative class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata effect on the Court's proposed class members. Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis.

As a practical matter, many of the questions raised relating to competing state and federal class actions have been obviated by the passage of CAFA, which has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008). Although CAFA's primary effect has been to make superiority determinations easier by placing limitations on state court class actions that could overlap with federal class actions, it also raises novel questions, such as whether and when the court -- in light of CAFA's explicit purpose to push more multistate class actions into federal court -- should conclude that the availability of a state court aggregation device destroys superiority of a proposed federal class action.

defined to avoid class member-overlap with previously certified classes or else should assert different claims.

The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.   Fed. R. Civ. P. 23(b)(3)(C).   The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.   See Newberg § 4:71.   The second prong is whether the particular court at issue is a desirable forum for the litigation.   Some issues that reliably influence the determination of this prong include: (i) the geographic convenience of the parties, witnesses, or class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001)(Gould, J.); (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Bolton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004)(Fuentes, J.).   "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division.   Rather, the prong's inquiry extends all the way down to the level of the individual district judge.   For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004)(Tjoflat, J.); if he or she has other, similar actions consolidated in his court,

see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003)(Young, J.); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

The fourth, final, and most important factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members. See Fed. R. Civ. P. 23(b)(3)(D). The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974). Courts should not judge manageability in a vacuum, but rather -- as a part of the superiority analysis -- they should assess how the difficulties the class action device present stack up against the difficulties that other available procedural mechanisms present. See Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1358 (11th Cir. 2009)(Pryor, J.)("[W]e are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives.")(citation omitted). The principal concern in a manageability inquiry is individualization. The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues. See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.). As such, several courts have held that, if the predominance

requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> The predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010)(internal citations and quotation marks omitted)(Marcus, J.).  See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

### ii.        The Predominance Requirement.

Rule 23(b)(3)'s second requirement is predominance of common questions over individual ones.  See Fed. R. Civ. P. 23(b)(3).  While the question of superiority evaluates the desirability of the class action device relative to other procedural forms, the predominance inquiry is absolute.  Predominance means that the questions common to the class predominate over those that are individualized.  A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(Arnold, J.), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006)(Straub, J.).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much

stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>      . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

Monread v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

The predominance inquiry is a qualitative, not quantitative, one; a single common issue may predominate over numerous individual ones.  See Butler v. Sears, Roebuck & Co., 727 F.3d 796, 801 (7th Cir. 2013)(Posner, J.); Chavez v. Don Stoltzner Mason Contractor, Inc., 272 F.R.D. 450, 455 (N.D. Ill. 2011)(Kennelly, J.); Olson v. Tesoro Refining & Mktg. Co., No. C06-1311 RSL, 2007 WL 2703053, at *6 (W.D. Wash. 2007)(Lasnik, J.).  Likewise, rule 23(b)(3) "does not require that common issues be dispositive or significant," but merely that they predominate over the individual inquiries.  In re Potash Antitrust Litig., 159 F.R.D. 682, 699 (D. Minn. 1995)(Kyle, J.).  That the answer to a common question is not disputed -- for example, if the parties have stipulated as to the answer or the court has already ruled -- does not affect either its commonality or its ability to predominate.  See In re Nassau Cnty. Strip Search Cases, 461 F.3d at 228.

Examining the case law, the Court notes several recurring individual issues that often exist in the class action context, but which rarely defeat a predominance finding, such as: (i) individual damage calculations, especially when an objective -- usually formulaic -- damages determination can be made without individual subjective inquiry, see Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1437 (2013)(Ginsburg & Breyer, JJ., joined by Sotomayor & Kagan, JJ., dissenting)("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."); (ii) a defendant's desire to assert individual counterclaims -- generally speaking, counterclaims, even common ones, are not permitted against absent class members at all, see Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985); Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003)(Wilson, J.); (iii) a defendant's desire to assert individual affirmative defenses, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)(Lynch, J.)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."); or (iv) a defendant raising individual statute-of-limitations defenses.[6]  Other recurring individual issues present more serious challenges to predominance,

---

[6]Limitations defenses generally present a common question, and not an individual one. Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the statute -- then it typically does not defeat predominance.

Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[7] (ii) differences in the applicable law in a multi-state, state law-based class actions, see Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996)(Smith, J.); and (iii) the need to determine individual personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.  The Court concludes that the best approach -- one that is rooted in rule 23's text, gives the otherwise vague term content, and advances the purposes of the class certification inquiry -- is to assess predominance through the lens of rule 23(b)(3)(D), the manageability inquiry.  See Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184.  A proposed class action satisfies predominance if common issues exist in the "right" places in the case that allow

---

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[7]The advisory committee notes to rule 23 state that:

a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

the court to adjudicate the dispute fairly and efficiently -- to accurately resolve all the claims for

which the court certifies the class.

> [A] court addressing predominance must determine whether the evidence about
> the putative class representative's circumstances and the opposing evidence from
> the defense will enable a jury to make across-the-board "yes" or "no" factual
> determinations that fairly resolve the claims of the entire class.  Where the right to
> recover for each class member would "turn . . . on facts particular to each
> individual plaintiff," class treatment makes little sense.  If the resolution of the
> common issues devolves into an unmanageable variety of individual issues, then
> the lack of increased efficiency will prohibit certification of the class.

> The predominance and efficiency criteria are of course intertwined.  When
> there are predominant issues of law or fact, resolution of those issues in one
> proceeding efficiently resolves those issues with regard to all claimants in the
> class.  When there are no predominant issues of law or fact, however -- as in the
> instant case -- class treatment would be either singularly inefficient, as one court
> attempts to resolve diverse claims from around the country in its own courtroom,
> or unjust, as the various factual and legal nuances of particular claims are lost in
> the press to clear the lone court's docket.

See McLaughlin on Class Actions § 5:23 (10th ed.)(footnotes omitted)(quoting Jackson v. Motel

6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)(Tjoflat, J.)).

District courts have myriad tools for managing class actions and can design new tools to

suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,'

procedural innovation often replaces procedural conservatism."   Jay Tidmarsh & Roger H.

Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).   Most techniques that are truly

"procedural" are fair game: cases can be bifurcated, trifurcated, or polyfurcated; trials can be

conducted in multiple stages or phases; and, provided that each defendant's overall monetary

liability can be ascertained, the sometimes difficult question of how to distribute said damages

among the class can be addressed with less formality.[8]   Techniques that merely presume away

---

[8]Defendants have a Due Process right to have any damages against them proven in court.
The question of how to distribute those damages among the class, however, does not implicate
the defendants' rights at all, and, thus, that process can be conducted in a non-adversarial

substantive elements that normally must be proven by the plaintiff, or that would impair a defendant's Due Process rights, however, are not permissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics," or "trials by formula," either as to liability or damages.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561.  This formerly popular tool involved a small but representative sample of class members presenting evidence on individual questions in their own cases and inviting the jury to extrapolate its conclusions from the sample to the entire class.  See, e.g., Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561.

The Supreme Court bars this method of trying cases, because it violates the defendant's right to have (i) each element of (ii) each claim asserted against it by (iii) each class member specifically proven.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561.[9]  When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; this common determination forms the basis of the class action.  Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.

---

fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages.  The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially when the alternative is denying certification.

[9]The Supreme Court based its holding disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the Constitution of the United States.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

Although courts cannot sacrifice the defendant's rights for the economic convenience of the plaintiffs, neither should they forego the advantages of class certification merely to convenience the defendant in carrying burdens that the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members does not weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parol evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses -- such as that certain class members waived performance of the disputed term.  The defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  Just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, it would have to expend the same energy and resources if the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- does not excuse the defendant of its ordinary litigation burdens.  In short, the issues that most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's

burden to answer at trial: elements of the prima facie case and individualized rebuttals of any

common affirmative defenses that the defendant asserts.

      **c.**    **<u>Class Order</u>.**

Rule 23(c) provides the requirements for a court order certifying a class:

> **(a) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**
>
>     **(1) Certification Order.**
>
> > (A) Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.
> >
> > (B) Defining the Class; Appointing Class Counsel. An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).
> >
> > (C) Altering or Amending the Order. An order that grants or denies class certification may be altered or amended before final judgment.

Fed. R. Civ. P. 23(c).  The United States Court of Appeals for the Third Circuit addressed the

rule 23(c)(1)(B)'s requirements after the 2003 amendments to the Federal Rules of Civil

Procedure, holding that "Rule 23(c)(1)(B) requires district courts to include in class certification

orders a clear and complete summary of those claims, issues, or defenses subject to class

treatment."  <u>Wachtel v. Guardian Life Ins. Co. of America</u>, 453 F.3d 179, 184 (3d Cir.

2006)(Smith, J.). The Third Circuit noted that "most district court opinions fell short of this

standard." <u>Nafar v. Hollywood Tanning Sys., Inc.</u>, 339 F. App'x 216, 219 (3d Cir. 2009).

      The proper substantive inquiry for an appellate tribunal reviewing a certification order for

Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class, and a complete

list of the claims, issues, or defenses to be treated on a class basis, are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion. Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d at 185.

**2.      Collective Actions Under § 216(b).**

Under the FLSA's 216(b), "any one or more employees" may maintain an action to recover unpaid overtime wages "for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  This provision provides the exclusive mechanism to certify an FLSA class action. See Prickett v. DeKalb Cnty., 349 F.3d 1294, 1296 (11th Cir. 2003)(per curiam).  The Eleventh Circuit explained that "FLSA plaintiffs may not certify a class under Rule 23" because § 216(b)'s opt-in requirement demonstrates that Congress intended FLSA plaintiffs to use § 216(b).  Section 216(b) requires a potential collective-action member to "give his consent in writing" to become a party.  29 U.S.C. § 216(b).  Rule 23(b), in contrast, considers each person within the class description as a class member unless he or she opts out. Fed. R. Civ. P. 23(b).  See LaChapelle v. Owens Illinois, Inc., 513 F.2d 286, 289 (5th Cir. 1975)(per curiam)("There is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 16(b)."); Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. 431, 432 (D. Kan. 2007)(Vratil, J.)(finding § 216(b) to be the exclusive means to certify an FLSA class action).  Because of the procedural discrepancy between § 216(b) collective actions and rule 23 class actions, courts have found that the FLSA's § 216(b) opt-in procedure preempts rule 23's class-action procedure.  See King v. Gen. Elec. Co., 960 F.2d 617, 621 (7th Cir. 1992)(Cudahy, J.)(interpreting the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 -- which expressly incorporates the collective action provisions of the FLSA -- and finding that the FLSA's § 16(b) opt-in procedure preempts rule

23's class-action procedure); Lusardi v. Lechner, 855 F.2d 1062, 1068 n.8 (3d Cir. 1988)(Hutchinson, J.)("Courts have generally recognized that Rule 23 class actions may not be used under FLSA § 16(b)."); Grayson v. K Mart Corp., 79 F.3d 1086, 1106 (11th Cir. 1996)(Garth, J.)("Congress clearly adopted the opt-in joinder procedures of Section 216(b) of the FLSA and thus impliedly rejected the Rule 23 class action procedures.").

To use § 216(b)'s collective-action mechanism, each employee who wishes to pursue his claims under the FLSA must affirmatively opt in to the case in writing.  See 29 U.S.C. § 216(b)("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such an action is brought.").  Potential plaintiffs must therefore obtain notice about the pending collective action so they can decide whether to participate.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).  The FLSA authorizes parties to send notice of the opportunity to opt in to the collective action if members of the proposed class are "similarly situated."  29 U.S.C. §216(b).

Although the FLSA does not define the phrase "similarly situated," the Tenth Circuit has established an ad hoc approach where the court determines on a case-by-case basis whether the members of the putative class are similarly situated.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105.  By adopting the "similarly situated" standard, as opposed to rule 23's standard, the Tenth Circuit has found that Congress chose to authorize collective actions under a less-stringent standard than rule 23 class actions.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105 ("Congress clearly chose not to have the Rule 23 standards apply to class actions under the ADEA, and instead adopted the 'similarly situated' standard.  To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 . . . would effectively ignore Congress' directive.").  See Hoffman-La Roche Inc. v. Sperling, 493 U.S. at

170 (interpreting the ADEA and finding that by enacting § 216(b)'s "similarly situated" language, "Congress has stated its policy that . . . plaintiffs should have the opportunity to proceed collectively.").

Under the Tenth Circuit's approach, the court engages in a two-step process.  First, the court makes an initial determination whether the plaintiffs are "similarly situated" at the notice stage.  The initial determination decides whether a collective action should be certified for purposes of notifying potential class members.  See Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010)(Livingston, J.); Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432.  The plaintiff bears the burden of showing that she is "similarly situated" to other potential class members; however, this burden is not great.  A plaintiff "need only describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist."  Schwed v. Gen. Elec. Co., 159 F.R.D. at 375-76. See Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432 (finding that this stage requires nothing more than substantial allegations that the proposed class members were together the "victims of a single decision, policy or plan").

Courts of Appeals that have considered the meaning of "similarly situated" have consistently defined the phrase to require a minimal showing.  See Myers v. Hertz Corp., 624 F.3d at 555 (requiring plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law'")(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)(Sotomayor, J.)); Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008)(Hull, J.)("[U]nder § 216(b), courts determine whether employees are similarly situated -- not whether their positions are identical.").  The plaintiff must support this "modest factual showing," see Dybach v. State of

Fla. Dep't of Corrections, 942 F.2d 1562, 1567 (11th Cir. 1991)(Kaufman, J.), "but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist," Myers v. Hertz Corp., 624 F.3d at 555. The Fifth Circuit has described the standard for certification at this stage as "lenient," typically resulting in class certification. Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 (5th Cir. 1995), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

The second step occurs at the close of discovery, after all potential plaintiffs have opted in to the action. See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1103. See also Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006)(Boggs, J.). The second stage requires the court to use a stricter standard of determining whether the class is "similarly situated" and may therefore proceed to trial as a collective action. This determination requires the court to evaluate several factors, including: (i) individual plaintiffs' disparate factual and employment settings; (ii) the defendants' various defenses that appear to be individual to each plaintiff; and (iii) fairness and procedural considerations. Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102-03.

## ANALYSIS

The primary issues are: (i) whether to conditionally certify this case as a collective action under 29 U.S.C. § 216(b); and (ii) whether to certify this case as a class action under rule 23(b)(3) of the Federal Rules of Civil Procedure. Because the Plaintiffs have pled facts that suggest that the proposed class is similarly situated with regard to the alleged FLSA violations, the Court will conditionally certify the case as a collective action. As to the second issue, the Plaintiffs have not yet demonstrated the proposed class' compliance with rules 23(a) and 23(b)(3). Accordingly, the Court will deny the request for class certification without prejudice to

allow them to renew it later, when and if they can support the motion with evidence. The Court thus grants the Motion in part and denies it in part.

## I.   THE PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO DEMONSTRATE THE PROPOSED CLASS IS "SIMILARLY SITUATED" WITHIN THE MEANING OF THE FLSA'S § 216(b).

The FLSA's § 216(b) allows "any one or more employees" to maintain an action to recover unpaid overtime wages "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  At the notice stage, the court makes an initial determination whether plaintiffs are "similarly situated."  This inquiry requires no more than substantial allegations that the proposed class members were together the "victims of a single decision, policy or plan." Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432. See Myers v. Hertz Corp., 624 F.3d at 555 (requiring plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law")(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. at 261; see Morgan v. Family Dollar Stores, Inc., 551 F.3d at 1260 ("[U]nder § 216(b), courts determine whether employees are similarly situated -- not whether their positions are identical.")(citing Grayson v. K Mart Corp., 79 F.3d at 1096).  Although the plaintiff must support this "modest factual showing," see Dybach v. State of Fla. Dep't of Corrections, 942 F.2d at 1567, "it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist." Myers v. Hertz Corp., 624 F.3d at 555.

Courts evaluate several factors in this initial determination, including whether potential class members: (i) have the same employer; (ii) are subject to the same employer practices; (iii) suffer the same method of calculation of wages owed; and (iv) allege FLSA violations based on the same conduct.  See Hasken v. City of Louisville, 213 F.R.D. 280, 282 (W.D. Ky. 2003).

Some courts focus more on the similarity between job duties and pay provisions of the plaintiffs and those in the proposed class.  See, e.g., Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1345 (N.D. Ga. 2002)(Story, J.)("The only determinative issue is whether Plaintiffs' job duties were similar."); Tucker v. Labor Leasing, Inc., 872 F. Supp. 941, 948 (M.D. Fla. 1994)(Schlesinger, J.).  Other courts focus more closely on the similarity of the plaintiffs' and proposed class members' claims.  See, e.g., Barron v. Henry Cnty. Sch. Sys., 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003)(Albritton, C.J.).

District courts in the Tenth Circuit consider numerous factors, without making one factor dispositive.  For example, in Hasken v. City of Louisville, the court found that the plaintiffs and potential opt-in plaintiffs were similarly situated where the defendant employer used the same method to calculate overtime compensation for all members of the group.  See 213 F.R.D. at 282.  The plaintiffs, current and former firefighters, alleged that the City of Louisville miscalculated the hourly rate of pay for overtime.  See 213 F.R.D. at 281.  All firefighters worked for the same employer, and were all subject to the same method for calculating overtime wages.  See 213 F.R.D. at 282.  Although the court found these facts insufficient to grant the motion to form a class under rule 23(b), the court granted the motion under the FLSA's § 216(b).  See 213 F.R.D. at 282.

Many Courts of Appeals also use a multi-factor approach.  For instance, the United Stated Court of Appeals for the Sixth Circuit found that proposed class members were similarly situated even though proof of an FLSA violation as to one plaintiff did not prove that the defendant violated any other plaintiffs' rights.  See O'Brien v. Ed Donnelly Enter., Inc., 575 F.3d 567, 585 (6th Cir. 2009)(Tarnow, J.).  The court noted that plaintiffs are clearly similarly situated "when they suffer from a single FLSA-violating policy, and when proof of that policy or of

conduct in conformity with that policy proves a violation as to all the plaintiffs."  575 F.3d at

585.  Even though proof of a violation as to one plaintiff did not clearly establish the defendant's

liability to other plaintiffs, the court found that the plaintiffs were similarly situated because all

of the plaintiffs based their claims on common theories of how the defendant violated the FLSA.

O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d at 585.  The court noted that proving the

defendant's liability to each plaintiff would require "individualized and distinct" proof.

Nevertheless, the plaintiffs argued they were all injured by the defendant's practices of forcing

employees to perform uncompensated work and editing time sheets.  O'Brien v. Ed Donnelly

Enterprises, Inc., 575 F.3d at 585.  In sum, because all of the plaintiffs were injured by the same

alleged FLSA violations, the court found them similarly situated.

Here, the Plaintiffs share many of the attributes the courts have found sufficient to meet §

216(b)'s standard.  First, the same employer, Hidalgo County, employs the Plaintiffs and the

members within each of the potential sub-classes.  See Motion at 11.  Second, they work in the

same location and perform largely similar job duties.  See Motion at 11.  Third, they are

members of the same bargaining unit governed by the same County Labor Ordinance, and are

subject to the same policies and operating procedures.  See Motion at 11.  Finally, and most

importantly, their damages all derive from the same "decision, policy or plan" of allegedly

requiring pre-shift, post-shift, or on-call work.  See Motion at 11.  As in O'Brien v. Ed Donnelly

Enterprises, Inc., all of the plaintiffs here based their claims on common theories of how the

defendant violated the FLSA.  See O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d at 585.  In

O'Brien v. Ed Donnelly Enterprises, Inc., the plaintiffs argued they and proposed collective-

action members were all injured by the defendant's practices of forcing employees to perform

uncompensated work and editing time sheets.  O'Brien v. Ed Donnelly Enterprises, Inc., 575

F.3d at 585.  Here, all of the plaintiffs argue that they and proposed collective-action members were all injured by Hidalgo County's practice of requiring employees to perform uncompensated pre-shift, post-shift, or on-call work.  In sum, all of the plaintiffs here (i) work for the same employer, (ii) operate under the same employment policies, and (iii) assert injuries arising from the same alleged FLSA violations.

The greatest difference between members relate to the extent of their damages.  This difference, however, does not defeat their claim.  "It is well established that individual questions with respect to damages will not defeat class certification . . . unless that issue creates a conflict which goes to the heart of the lawsuit."  Reab v. Elec. Arts, Inc., 214 F.R.D. at 629 (finding that plaintiffs demonstrated they were similarly situated to proposed class members)(citing Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81 (S.D.N.Y. 2001)); In re AM Int'l, Inc. Sec. Litig., 108 F.R.D. 190 (S.D.N.Y. 1985).

Small differences between plaintiffs and proposed class members will not prevent the court from finding them similarly situated.  Where proposed class members are employed in similar positions, that the employer defendant engaged in a pattern of not paying overtime is sufficient to allege that plaintiffs are similarly situated with potential opt-in plaintiffs.  See Brown v. Money Tree Mortg. Inc., 222 F.R.D. 676, 681 (D. Kan. 2004)(Lungstrum, J.); Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434. Some variation in their specific job duties will not destroy this designation at this stage of the litigation.  See Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 434 (declaring the potential plaintiffs similarly situated with the named plaintiffs despite variation in the job duties, so long as they all shared responsibility in maintaining point-of-sale systems); Pivonka v. Bd. Of Cnty. Comm'rs of Johnson Cnty., Kan., No. 04-2598-JWL, 2005 WL 1799208, at *4 (D. Kan. July 27, 2005)(Lungstrum, J.)(finding that

variations in job duties did not destroy the initial class certification where all employees shared general duties and their injuries all arose from the employer's failure to pay overtime).  Given that (i) the same defendant employer employed all of the Plaintiffs and the proposed class members, (ii) the Plaintiffs and the proposed class members all performed similar job duties, and (iii) the Plaintiffs and the proposed class members all assert injury from the same alleged FLSA violations, the Plaintiffs have satisfied the low threshold to demonstrate at the initial notice stage that all proposed class members are similarly situated for purposes of conditional collective action certification under the FLSA's § 216(b).

Hidalgo County's arguments are unavailing at this first step of the Tenth Circuit's ad hoc approach.  Hidalgo County first argues that the Court should use a more rigorous standard for certification at the initial notice stage, because a significant amount of discovery has already been conducted.  See Response at 2-3.  As Hidalgo County concedes, however, courts within the Tenth Circuit have generally refused to bypass the lenient stage.  See Response at 3;  id. at 3 n.2.  Hidalgo County argues that courts use the lenient standard in early stages of the litigation because the plaintiffs have not had enough time to conduct discovery.  See Response at 3. But this is not the only reason courts use the lenient standard.  Rather, courts use a lenient standard at the initial stage to follow Congress' intent in creating a different standard from rule 23.  The Tenth Circuit has made this finding expressly.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105 (finding that Congress chose to authorize collective actions under a less-stringent standard than class actions under rule 23).  Even if the case law does not strictly foreclose a more stringent standard when the parties have engaged in more discovery, bypassing the lenient review at the initial notice stage would circumvent Congress' intent in creating § 216(b)'s more lenient certification mechanism.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105

("Congress clearly chose not to have the Rule 23 standards apply to class actions under the ADEA, and instead adopted the 'similarly situated' standard.  To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 . . . would effectively ignore Congress' directive.").

District courts within the Tenth Circuit have uniformly refused to bypass the lenient stage, even after significant discovery.  See Smith v. Pizza Hut, Inc., 2012 WL 1414325, *4 (D. Colo. 2012)(Arguello, J.)(noting that no other courts within the Tenth Circuit have bypassed the lenient notice stage standard on account of discovery).  "[C]ourts within the Tenth Circuit have consistently declined invitations to proceed directly to the more rigorous second stage analysis." See Smith v. Pizza Hut, Inc., 2012 WL 1414325, *4.  In Gieseke v. First Horizon Home Loan Corp., 408 F. Supp. 2d 1164, 1166-67 (D. Kan. 2006)(Murguia, J.), the court refused to bypass the initial notice stage even though the parties had taken multiple depositions and the defendant produced nearly 6,000 documents.  Again, in Pack v. Investools, Inc., 2011 WL 3651135, at *3 (D. Utah Aug. 2011)(Stewart, J.), the court declined to bypass the notice stage standard even though the defendant had provided over 8,874 documents and responded to all of the plaintiff's interrogatories and requests for admissions.  2011 WL 3651135, at *3.  Additionally, district courts have emphasized that "following both steps of Thiessen's two-step approach results in the least risk of prejudice to both parties."  Smith v. Pizza Hut, Inc., 2012 WL 1414325, *4.  If the court bypassed the first step, some plaintiffs might not learn of the lawsuit at all.  "Measured against this possible prejudice to Plaintiffs, delaying the second stage review risks little harm to Defendant, who will be free to move for decertification after the close of discovery."  Smith v. Pizza Hut, Inc., 2012 WL 1414325, *4.

Moreover, the cases Hidalgo County cited to support its argument that the court should apply a more stringent standard after the parties have conducted a certain amount of discovery do not all advance that proposition.   Courts have not necessarily increased the standard for determining whether parties are similarly situated.  Instead, they require more evidence than the plaintiff's allegations to demonstrate that parties are similarly situated.   In cases where the parties have conducted little discovery, less information is available to analyze whether the plaintiffs are similarly situated with proposed collective-action members.  See Mooney, 54 F.3d at 1214 (finding that "[b]ecause the court has minimal evidence, [the notice] determination is made using a fairly lenient standard").   In these cases, courts must consider whether plaintiffs are similarly situated using only the plaintiff's affidavits and allegations.  See Morisky v. Pub. Serv. Elec. and Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000)(Pisano, J.)(noting that before discovery the court must determine whether the parties are similarly situated based on "only minimal evidence before [the court] -- the pleadings and any affidavits submitted by the parties").   After the parties have conducted extensive discovery, however, the court has more information on which to base its determination.  As stated in White v. Osmose, Inc., the court can "carefully consider" the parties' submissions, "rather than merely relying on the handful of affidavits that support [the plaintiff's] position."  White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002)(Albritton, C.J.).

Similarly, in Morisky v. Pub. Serv. Elec. and Gas Co., the court stated it would apply a "stricter standard" in its analysis because the parties had conducted a significant amount of discovery.  Yet in doing so, it merely required substantiated evidence to support the plaintiffs' claims that they were similarly situated with proposed class members.  111 F. Supp. 2d at 498. The plaintiffs alleged they were similarly situated by referencing "an extremely broad general

connection all plaintiffs have to the production of electricity." Morisky v. Pub. Serv. Elec. And Gas Co., 111 F. Supp. 2d at 498.  They presented no proof of this connection and did "not even discuss the job responsibilities of the opt-in plaintiffs."  111 F. Supp. 2d at 498.  In comparison, the defendants presented concrete evidence of the vast discrepancies in the proposed class members' job duties and the policies to which they were subject.  111 F. Supp. 2d at 498 (noting that while the plaintiffs made only general assertions of similarity, the defendants referenced over 100 fact questionnaires).  Moreover, more than 100 plaintiffs had already opted into the lawsuit and the parties had completed discovery before the plaintiff requested the court to certify the collective action.  111 F. Supp. 2d at 497-98.

Here, the Plaintiffs support their assertion that they are similarly situated to proposed class members with more than mere allegations in the complaint.  Rather, they present proof through Hidalgo County's posted job descriptions, deposition testimony, and Hidalgo County's policies and procedures manuals.  See Motion at 11; Job Description Hidalgo County, Motion Exhibit 1, filed September 30, 2014 (Doc. 33-2); Hidalgo County Detention Center Policy and Procedure ("Hidalgo County Policy and Procedure"), Motion Exhibit 3, filed September 30, 2014 (Doc. 33-5); Hidalgo County Dispatch Handbook ("Hidalgo County Dispatch Handbook"), Motion Exhibit 6, filed September 30, 2014 (Doc. 33-8).  Importantly, the Plaintiffs can show that both they and the proposed class members assert they were injured from the same employment practice of allegedly requiring them to perform uncompensated work.  Hidalgo County Policy and Procedure; Hidalgo County Dispatch Handbook.

Even using the lenient standard the Tenth Circuit requires at the notice stage, Hidalgo County argues that the Plaintiffs cannot demonstrate that they are similarly situated with other proposed class members.  Hidalgo County argues that Jimenez and Vogelsang-Wolf interpreted

their employers' policies differently, making them dissimilarly situated. See Response at 7. Specifically, it argues that Vogelsang-Wolf's claims are based on her on-call time, while Jimenez' claims are based on her pre-shift and post-shift work. See Response at 8. The standard at this stage does not require the plaintiffs be in the exact same situation as other potential plaintiffs, however. It merely requires that the plaintiff show a "colorable basis" for the claim of similarity. Schwed v. Gen. Elec. Co., 159 F.R.D. at 375-76 (N.D.N.Y. 1995). See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001)("The 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance).")(quotation marks and citation omitted). There is more than a "colorable basis" for the claim of similarity here.

Unlike the plaintiffs in the cases that Hidalgo County cites as a basis for denying certification, the Detention Officers here were all subject to one set of Post Orders and Standard Operating Procedures, and the Dispatch Operators were all subject to one set of Policies and Procedures. See Reply at 4. See also Maxwell Depo., 23:7-12, 104:23-105, 106:11-108:1. They also perform substantially similar job duties as others in the same subclass. See Reply at 5. The unpublished cases that Hidalgo County cites involved proposed class members subject to disparate employment policies and procedures, or cases where employees performed "widely varying job duties." Pfohl v. Farmers Ins. Grp., 2004 WL 554834, at *9 (C.D. Cal. 2004)(Tevrizian, J.). For example, in Sheffield v. Orius Corp., 211 F.R.D. 411, 413 (D. Or. 2002)(Haggerty, J.), proposed class members "held different job titles, enjoyed different payment structures (piece-rate, hourly, and salaried), and worked at nine different job sites." In Ray v. Motel 6 Operating, Ltd. Partnership, 1996 WL 938231 (D. Minn. 1996)(Kyle, J.), the overtime scheme was "controlled by area supervisors" and "decentralized." 1996 WL 938231, at

*4.  Similarly, in <u>Basco v. Wal-Mart Stores, Inc.</u>, 2004 WL 1497709 (E.D. La. 2004)(Duval, J.), "the store's policy was not even uniformly or systematically implemented at any given store." 2004 WL 1497709, at *7.  And again in <u>Saarela v. Union Colony Protective Services, Inc.</u>, 2014 WL 3408771 (D. Colo. 2014)(Krieger, J.), it was unclear whether the plaintiff asserted a generally-applicable corporate policy or "an idiosyncratic policy [that] applied only to" the plaintiff.  2014 WL 3408771, at *3.

Here, all employees in each proposed subclass perform substantially similar job duties at one single facility, overseen by a single administrator who implements uniform policies common to all proposed class members.  <u>See</u> Reply at 5.  With this showing of similar situations, the Court should consider any further dissimilar employment settings among proposed class members at the second stage of the Tenth Circuit's two-step analysis, after completing discovery. <u>See</u> <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d at 1103.  At the initial stage, the plaintiffs "need only show that [their] positions [are] similar, not identical to the positions held by the putative class members."  <u>Pritchard v. Dent Wizard Int'l, Corp.</u>, 210 F.R.D. 591, 595 (S.D. Ohio 2002)(Sargus, J.).  Moreover, mere differences in "damages will not defeat class certification . . . unless that issue creates a conflict which goes to the heart of the lawsuit."  <u>Reab v. Elec. Arts, Inc.</u>, 214 F.R.D. at 629.

Finally, Hidalgo County argues that there is no need for notice at this stage.  Rather, Hidalgo County asserts that the Plaintiffs' counsel could simply contact potential collective-action members personally.  <u>See</u> Response at 10-11.  Once again, however, this proposal negates the purpose of § 216(b)'s procedural mechanism, which was intended to facilitate notice through the courts.  "It would be anomalous for Congress to provide a class action remedy, and, at the same time, require that a class action's existence be hidden from potential class members."

Allen v. Marshall Field & Co., 93 F.R.D. 438, 442 (N.D. Ill. 1982)(Will, J.).  Further, this notice need not wait for a conclusive finding that every single plaintiff is irrefutably "similarly situated."  Sperling v. Hoffman-La Roche, Inc., 118 F.R.D. 392, 406 (D.N.J. 1988)(Ackerman, J.), aff'd, 862 F.2d 439 (3d Cir. 1988), aff'd, 493 U.S. 165 (1989).  The record need only be "sufficiently developed . . . to allow court-facilitated class notice."  Sperling v. Hoffman-La Roche, Inc., 118 F.R.D. at 406.  Accordingly, the Court grants the conditional collective action under § 216(b).

## II.   THE PLAINTIFFS HAVE NOT PLED SUFFICIENT FACTS TO COMPLY WITH RULES 23(a) AND 23(b)(3).

To certify a class under the Federal Rules of Civil Procedure, the Plaintiffs must satisfy rule 23(a)'s prerequisites, and one of the three sets of rule 23(b)'s requirements.  The plaintiff bears the burden of showing that the requirements are met.  See Reed v. Bowen, 849 F.2d at 1309.  The Plaintiffs can pursue only their state law claims through rule 23.  They must pursue their FLSA claims using the collective action mechanism the FLSA's § 216(b) provides.

In ruling on a class certification motion, the Court does not conclusively decide the merits, but it must independently find the relevant facts to a preponderance of the evidence.  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234.  "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234.  As the Supreme Court recognized in Wal-Mart Stores, Inc. v. Dukes, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." 131 S. Ct. at 2551-52.  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2551-52.

In line with these requirements, the Court does not decide the merits of the Plaintiffs' state law claims. It must, however, examine the Plaintiffs' substantive claims to "make a meaningful determination of the certification issues." Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 317-18 (stating that "whether to certify a class requires a thorough examination of the factual and legal allegations" and that a "a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action")(citations omitted). The Court therefore denies the Plaintiffs' Motion on the basis that the Plaintiffs have not yet demonstrated compliance with rule 23(a) and 23(b)'s requirements. The Court does not conclusively reach the merits of the Plaintiffs' state law claims in this opinion. Nonetheless, the speculative nature of the Plaintiffs' state law claims serves as an additional basis to deny the Motion to certify under the FLSA's rule 23.

## A.    THE PROPOSED CLASS DOES NOT SATISFY RULE 23(a).

With only fifty proposed class members, this case sits at the lower end of the range of class sizes for which courts have certified classes. The Plaintiffs demonstrate they can satisfy rule 23(a)'s commonality, typicality, and adequacy requirements. But they have not, however, at this time demonstrated that this case meets the numerosity requirement.

### 1.    The Class is Not So Numerous That Joinder of All Members is Impracticable.

Although the Tenth Circuit has not adopted a numerical requirement to satisfy the numerosity element, class membership must be sufficiently large to make joinder impracticable. See Rex v. Owens, 585 F.2d at 436. This element requires the court to examine the facts of each case, without absolute limitations. See Gen. Tel. Co. of the Nw., Inc. v. E.E.O.C., 446 U.S. 318,

330 (1980).  The plaintiff must establish by reasonable estimate the number of class members who may be involved.  See Rex v. Owens, 585 F.2d at 436.

Here, the Plaintiffs assert that fifty potential plaintiffs exist.  They contend that "joining each of these potential plaintiffs into one litigation would be difficult in the extreme."  Motion at 15.  They fail to state explicit reasons why joining these potential members would be so difficult.  Furthermore, most of the proposed plaintiffs live in or near Lordsburg.  See Names and Addresses of Proposed Class Members, Motion Exhibit 8 (Doc. 33-10).  Only a handful of proposed plaintiffs reside out of state.  The proposed class therefore lacks the geographic diversity that favors a finding of numerosity.  Finally, the Plaintiffs have not established that all fifty potential plaintiffs were deprived of compensation and would be able to participate in the litigation.

Despite these concerns, case law demonstrates that plaintiffs may establish that joinder would be impracticable with as few as fifty members.  See In re Thornburg Mortg. Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1234 (D.N.M. 2012)(Browning, J.)(citing Robidoux v. Celani, 987 F.2d at 936 ("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable.")); Lopez v. City of Santa Fe, 206 F.R.D. at 289 (citing Olenhouse v. Commodity Credit Corp., 136 F.R.D. 672, 679 (D. Kan. 1991)(holding that joinder is impracticable where the class consisted of at least fifty members)).  The Court has not refused to certify a class on the sole basis that the proposed class contains few potential members.  See Lymon v. Aramark Corp., 2009 WL 5220285, at *5 n.3 (Browning, J.)(denying class certification on the basis that the plaintiff did not satisfy the commonality, typicality, and adequacy requirements, rather than numerosity, when the proposed class contained twenty-one members).

This case sits at the low end of the spectrum of class sizes for which courts have certified classes. If many potential plaintiffs choose to participate in the litigation, it could potentially make joinder impracticable, depending on the number of plaintiffs and where they currently reside. The Plaintiffs have not yet, however, demonstrated that to be the case. Moreover, at the class certification hearing, the Plaintiffs' lawyer reiterated the possibility that significantly fewer than fifty people might join the litigation, making joinder the preferable method. See Tr. at 30:17-22 ("Mr. Youtz: . . . [I]f we end up with ten plaintiffs or fifteen plaintiffs, we'll come to you maybe a little hat in hand and tell you, look, it's a smaller case than we anticipated, and maybe it would be -- maybe the best vehicle would be as individual plaintiffs."). Exercising its discretion, the Court therefore finds that a class of potentially fewer than fifty employees in this case does not satisfy rule 23(a)(1), and the Court will deny the request for class certification without prejudice to allow Plaintiffs to renew it later, when and if they can demonstrate that joinder would be impracticable.

### 2. The Plaintiffs Satisfy Rule 23(a)'s Commonality and Typicality Requirements.

Rule 23(a)(2) requires that common questions of law or fact exist among the class. See Fed. R. Civ. P. 23(a)(2). Rule 23(a)(3) requires that the class representatives' claims or defenses be typical of those of the class members sought to be included. See Fed. R. Civ. P. 23(a)(3). In other words, the representative must have the same interest and suffer the same injury as the class members. See DG v. Devaughn, 594 F.3d at 1198 (10th Cir.2010)(citing Adamson v. Bowen, 855 F.2d at 676).

Here, the core issues in the litigation are common among all of the Plaintiffs and potential plaintiffs. The fundamental issue is whether Hidalgo County required potential class members to perform uncompensated work. Hidalgo County asserts that the commonality and typicality

elements cannot be met, because the Plaintiffs have different interpretations of Hidalgo County's policies that other employees likely did not share.  See Response at 20.  Hidalgo County argues that different interpretations of its policies would lead some employees to perform different amounts of work.  Hidalgo County contends that it would be unreasonable to assume that "other employees have suffered the same injuries alleged by Plaintiffs."  Response at 20.

Although each Plaintiff and potential class member might have performed a different amount of allegedly uncompensated work, this possibility should not preclude the Plaintiffs from satisfying the commonality and typicality elements.  Factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d at 676 ("That the claims of individual putative class members may differ factually should not preclude certification.").  See In re Intelcom Grp. Sec. Litig., 169 F.R.D. at 148 (finding that factual differences in proposed class members' claims should not result in a denial of class certification where common questions of law exist); Lopez v. City of Santa Fe, 206 F.R.D. at 289 (finding that the fact that "the claims of individual putative class members may differ factually should not preclude certification under rule 23(b)(2) of a claim seeking the application of a common policy).  Similarly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. at 511.  Even though some plaintiffs may be entitled to more damages than others, all of the Plaintiffs' and proposed class members' claims are based on the same legal theory -- that they performed uncompensated work.  The proposed class members share this with the named plaintiffs, thus satisfying the typicality requirement.  All of the Plaintiffs and proposed class members share this with each other, thus satisfying the commonality requirement.

3. **The Plaintiffs Adequately Represent the Class.**

Rule 23(a)(4) requires that the proposed class representative adequately represent the class. See Fed. R. Civ. P. 23(a)(4). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

As to the first question, the named plaintiffs suffered the same injury -- allegedly uncompensated work -- as other potential class members. Although the amount of damages that the Plaintiffs and proposed class members suffer will differ, they all suffered damages in the form of uncompensated time. Further, those damages all stem from the same employment practices. The named Plaintiffs also performed substantially similar job duties as potential class members. Specifically, Jimenez performed the same dispatch duties as her colleagues. See Reply at 8. While Wolf worked as a corporal, her daily duties overlapped with those of typical detention officers. See Reply at 8. As to the second question, the Plaintiffs assert that their counsel is "experienced in wage-and-hour litigation," and "has litigated numerous class-action suits in state and federal court." Motion at 18. Because no conflicts exist between the named Plaintiffs and other class members, and the attorney has experience in class action litigation, the named Plaintiffs satisfy rule 23(a)(4)'s adequacy requirement.

B. **THE PROPOSED CLASS DOES NOT SATISFY RULE 23(b).**

Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories. See Fed. R. Civ. P. 23(b)(3). The Plaintiffs seek certification under rule 23(b)(3), which requires that "questions of law or fact

common to the members of the class predominate over any questions affecting individual members," and that the class action "is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed.R.Civ.P. 23(b)(3)(A)–(D).

1.  <u>Common Questions of Law and Fact Predominate Over Questions Affecting Individual Members.</u>

The predominance requirement is imposed to ensure the class is "sufficiently cohesive to warrant adjudication by representation."  <u>Amchem Prods. v. Windsor</u>, 521 U.S. at 623.  A question is common when "the same evidence will suffice for each member to make a prima facie showing," <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)(Arnold, J.), or when the issue is "susceptible to generalized, class-wide proof," <u>In re Nassau Cnty. Strip Search Cases</u>, 461 F.3d 219, 227 (2d Cir. 2006)(Straub, J.).  A case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance.  See <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. at 623-24.

Here, all of the Plaintiffs' claims hinge on the determination of the same issue: whether Hidalgo County required employees to perform pre-shift, post-shift, and on-call work for which they were not compensated.  Furthermore, the proposed class members will use the same evidence to prove their claim; namely, Hidalgo County's policies and handbooks, and employee testimony.  If Hidalgo County is found liable, individual questions about damages will certainly

- 71 -

arise.  The Plaintiffs must determine how many uncompensated hours each individual worked.

The Plaintiffs assert this calculation "can be determined on a purely mechanical basis," using

payroll data and shift schedules.  Motion at 22.  Despite the Plaintiffs' assertions, if employees

failed to record pre-shift or post-shift time, this determination will be subject to speculation and

individual accounts.   In spite of these difficulties, the predominance requirement does not

mandate that the common issues be dispositive of the entire case.  See In re Asbestos Sch. Litig.,

104 F.R.D. 422, 429 (E.D. Pa. 1984)(Kelly, J.); In re Potash Antitrust Litig., 159 F.R.D. 682, 699

(D. Minn. 1995)(Kyle, J.).

        The Supreme Court has concluded that individualized determinations of damages do not

necessarily defeat class certification, especially when an objective -- usually formulaic --

damages determination can be made without individual subjective inquiry.  See Comcast Corp.

v. Behrend, 133 S. Ct. 1426, 1437 (2013)(Ginsburg & Breyer, JJ., joined by Sotomayor &

Kagan, JJ., dissenting)("Recognition that individual damages calculations do not preclude class

certification under Rule 23(b)(3) is well nigh universal.").  See Yazzie v. Ray Vicker's Special

Cars, 180 F.R.D. 411, 417 (D.N.M. 1998)(Vazquez, J.)(finding that common issues

predominated despite that damages may differ among class members); Bolanos v. Norwegian

Cruise Lines Ltd., 212 F.R.D. 144, 148 (S.D.N.Y. 2002)(Berman, J.)("[I]f the liability issue is

common to the class, common questions are held to predominate over individual

questions.")(citations omitted).   The Supreme Court has expressly disavowed "trials by

statistics" or "trials by formula," either as to liability or damages.   Wal-Mart Stores, Inc. v.

Dukes, 131 S. Ct. at 2561.  This tool involves a small representative sample of class members

presenting evidence on individual questions in their own cases and inviting the jury to

extrapolate its conclusions from the sample to the entire class.  See, e.g., Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561.

In this case, the damages determination could involve individual determinations and significant testimony as to how many hours each employee worked for which they were not compensated.  Although the Plaintiffs assert that they could calculate each proposed class member's damages "on a purely mechanical basis," Motion at 22, they have not shown how they could do so if employees failed to record pre-shift or post-shift time.  As the Supreme Court rejects using a handful of plaintiffs as a representative sample, see Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. at 2561, the Plaintiffs are precluded from using the two named plaintiffs to represent the damages to which each proposed class member is entitled.  Accordingly, individual damages calculations have the potential to predominate over the liability issue.  The Plaintiffs may, however, later be able to demonstrate that they can more easily calculate each proposed class member's damages, in which case the liability issue would predominate.

### 2. The Plaintiffs Have Not Demonstrated that a Class Action is the Superior Method to Try the Case.

The requirement that a class action be the superior method of resolving the dispute ensures that no other method would be more efficient or have more practical advantages.  See Advisory Committee Notes to the 1966 Amendment to Fed. R. Civ. P. 23.  In addressing whether a proposed class action is superior, courts must start with the four factors that rule 23(b)(3)(A)−(D) enumerates, although those factors are not exhaustive.  See Advisory Committee Notes to the 1966 Amendment to Fed. R. Civ. P. 23.  The first factor, "the class members' interests in individually controlling the prosecution," closely tracks the money value of the individual cases.  Fed. R. Civ. P. 23(b)(3)(A).  Rule 23 does not provide varying remedies for individual suits as opposed to class suits.  The second enumerated (b)(3) factor, "the extent

and nature of any litigation concerning the controversy already begun by . . . class members," seeks to allow individual plaintiffs to control the path of the litigation.   Fed. R. Civ. P. 23(b)(3)(B).   Importantly, (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.   See Fed. R. Civ. P. 23(c)(2)(B).   Here, no other proposed class members have filed a case making similar claims in another location.   Moreover, three of the initial five plaintiffs who filed this case have subsequently dropped out of the litigation. Allowing Plaintiffs to form a class here would not likely preclude others from individually controlling their own litigation.

The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum."   Fed. R. Civ. P. 23(b)(3)(C).   Whether aggregation is desirable is considered a recitation of the general superiority inquiry; courts should, additionally, consider the interest of judicial economy.   See Newberg § 4:71.   At this stage of the litigation, the Plaintiffs have not yet established that a class action would be more desirable than joining individual plaintiffs.   As Hidalgo County notes, other potential class members may not have ever performed any pre-shift, post-shift, or on-call work for which they could seek compensation.   Should significantly fewer class members choose to participate in the litigation, there may be only a handful of potential plaintiffs.   Joining them individually may be superior to trying the case as a class action.   The Plaintiffs' counsel conceded this fact at the class certification hearing.   See Tr. at 30:17-22 ("Mr. Youtz: . . . [I]f we end up with ten plaintiffs or fifteen plaintiffs, . . . maybe the best vehicle would be as individual plaintiffs."); Tr. at 32:25-33:1 ("Mr. Youtz: . . . I don't know that it would need frankly to be certified as a 23(b)(3) class.").   Moreover, judicial economy influences this inquiry.   The Plaintiffs have not shown that class action litigation would save the judiciary's resources in any way.   There are

only fifty proposed class members, and three of the initial five plaintiffs who filed this action have already dropped out.  No other proposed class members have filed a case elsewhere and the Plaintiffs have presented no evidence that they intend to do so.  In sum, the Plaintiffs have not shown that without a class action, proposed class members who could not join this action would burden the court system.

On the other hand, if all fifty potential class members allege that they were not compensated for time worked, a class action could be superior to holding more than fifty separate trials, all of which would rely on similar evidence.  Moreover, the fourth (b)(3) factor weighs in the Plaintiffs' favor.  This factor instructs the court to consider the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues. See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).

As discussed in more depth above, one issue sits at the center of the litigation -- whether Hidalgo County failed to compensate employees for pre-shift, post-shift, and on-call work. Adding more plaintiffs will require the court to make individualized determinations about damages.   Yet Courts of Appeals have stated that damages questions do not defeat predominance, unless the damages issue goes to the heart of the litigation.   And if the predominance requirement is met, case law instructs courts not to decline to certify the class on manageability grounds alone.  Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184.  Nonetheless, because of the uncertainty regarding the number of

plaintiffs eligible to join the lawsuit at this time, the Court will deny the motion to certify under rule 23 without prejudice and allow the Plaintiffs to renew their request later.

### C.     COUNTS I AND III DO NOT PROVIDE A SOUND BASIS FOR RULE 23(b)(3) CERTIFICATION.

The Plaintiffs seek certification of a class action under rule 23(b)(3) for their state law claims.  The Court does not, however, at the class certification stage, decide the merits of the Plaintiffs' state law claims.  Nevertheless, to "make a meaningful determination of the certification issues," the Court must go beyond the pleadings, "as a court must understand the claims, defenses, relevant facts, and applicable substantive law."  Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234.  As discussed in more depth below, two of the Plaintiffs' state law claims likely cannot support a class action.

### 1.     The Alleged State Wage and Hour Law Violation, Count I, Does Not Provide a Sound Basis to Support the Plaintiffs' Collective Action.

The Plaintiffs' state law claims are for the same behavior that allegedly constitutes the FLSA violations.  Specifically, Count I alleges a claim under New Mexico wage and hour laws for unpaid wages in violation of unspecified portions of NMSA §§ 50-4-1–50-4-30.  See Complaint, ¶ 21, at 4.[10]  The New Mexico Minimum Wage Act ("NMMWA") provides, "[a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours."  See § 50-4-22(D) NMSA.  Yet the NMMWA expressly

---

[10]The Plaintiffs may pursue both a rule 23 class action for their state law claims and a § 216(b) action for their FLSA claims.  See Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245-50 (2d Cir. 2011)(Miner, J.)(allowing the plaintiffs to pursue damages under the state minimum wage law through rule 23, as well as damages under the FLSA through FLSA § 216(b)).  See also Advisory Committee's Notes to Federal Rule 23(b)(3)("The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.").

exempts public employers like Hidalgo County from the overtime and minimum wage provisions found in §§ 50-4-19 – 50-4-30 NMSA.  See §§ 50-4-21(B), (C)(3) NMSA.  See also Brubach v. City of Albuquerque, 893 F.Supp.2d 1216, 1237 (D.N.M. 2012)(Vazquez, J.)(stating that "the overtime provisions in the New Mexico statute do not apply to public employers such as the City").   After conceding this point, see Plaintiffs' Response to Defendant's Motion and Memorandum for Summary Judgment on All of Plaintiff Martha Jimenez's Claims at 18 ("Response to MSJ"), filed Dec. 11, 2014 (Doc. 48), the Plaintiffs for the first time specifically alleged violations of § 50-4-2(b) to support Count I.  See Response to MSJ at 18 .

Section 50-4-2(b), however, governs the timely payment of wages.  See, e.g., Rainaldi v. City of Albuquerque, 338 P.3d 94, 96 (N.M. Ct. App. 2014)(Hanisee, J.)(referring to § 50-4-2 as a "statutorily mandated compensation schedule").  In Rainaldi v. City of Albuquerque, the New Mexico Court of Appeals found that § 50-4-2 imposes two distinct wage payment requirements:

> (1) that employers "shall designate regular pay days, not more that sixteen days apart, as days fixed for the payment of wages to all employees paid in [the] state[,]" and (2) that employers "shall pay for services rendered from the first to the fifteenth days ... by the twenty-fifth day of the month during which services are rendered, and for all services rendered from the sixteenth to the last day of the month ... by the tenth day of the succeeding month.

338 P.3d at 96.  The court stated that this provision requires the employer to "pay its employees within ten days of the end of a particular pay period" for a "service rendered by the employee, determined by the City to be compensable."  Rainaldi v. City of Albuquerque, 338 P.3d at 100 (emphasis added).

Notably, § 50-4-2 does not provide a cause of action to sue for wages of disputed compensability.  "When a state wage-payment law applies, it requires timely payment of undisputed wages. . . . [T]he wage-payment law may not apply because . . . the payments sought are not 'wages' covered by the law."  Restatement of Employment Law § 3.01 (Proposed Final

Draft 2014)(referencing § 50-4-2 when stating that laws governing timely payment of wages "regulate the timing of payment of wages and often require payment of the <u>undisputed part</u> of wages.")(emphasis added).  In fact, there is no case law authorizing a private cause of action under § 50-4-2(b) for wages of disputed compensability.  New Mexico labor statutes provide mechanisms to sue for wages in dispute, unpaid overtime, and minimum wages.  Specifically, § 50-4-26(C) provides that employers "shall be liable to employees affected in the amount of their unpaid or underpaid minimum wages."  § 50-4-26(C).  Then, § 50-4-26(D) provides a cause of action to recover those unpaid wages:

> An action to recover such liability may be maintained . . . by any one or more employees for and on behalf of the employee or employees and for other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action on behalf of all employees similarly situated.

§ 50-4-26(D) NMSA.  As stated above, however, the MWA expressly exempts public employers like Hidalgo County from these provisions.  <u>See</u> §§ 50-4-21(B), (C)(3).

Second, § 50-4-7 provides a specific procedure for recovering wages in dispute from public employers.  <u>See</u> § 50-4-7 NMSA.  Finally, § 50-4-17 subjects public employers to fines and penalties for failing to comply with New Mexico's wage and hour provisions.  That the wage and hour laws provide these mechanisms demonstrates that the New Mexico Legislature did not intend to provide a private cause of action to recover wages in § 50-4-2(b).  To use § 50-4-2, which requires employers to pay employees on designated semimonthly or monthly pay days, to sue a public employer for wages of disputed compensability would circumvent the NMMWA's remedial scheme.  Because the Plaintiffs cannot maintain a suit for the payment of ordinary wages under New Mexico wage and hour laws against Hidalgo County, the claim fails as a matter of law and cannot be a sound basis for a rule 23 action.

## 2.   The Plaintiffs' Breach of Contract Claim, Count III, Does Not Provide a Sound Basis to Support the Plaintiffs' Collective Action.

The Plaintiffs' next state law claim, Count III, asserts a breach of contract.  The Plaintiffs allege that Hidalgo County was a party to an implied employment contract which required it to pay for "hours worked and overtime."  See Complaint, ¶ 29, at 5.  The Plaintiffs argue that Hidalgo County's polies and handbooks form the basis of this contract.  See Response to MSJ at 19.  While an employee handbook or other policies can form the basis of an implied contract, see Lopez v. American Baler Co., 2014 WL 1285448, *20 (D.N.M. March 27, 2014)(Browning, J.), the Supreme Court of New Mexico has expressly stated that "an agreement to do what one is already legally bound to do is not sufficient consideration for the promise to another."  See Salazar v. City of Albuquerque, 2013 WL 5554185, at *46 (citing to Bank of Santa Fe v. Biava, 109 N.M. 550, 551, 787 P.2d 830, 831 (1990)).

In Salazar v. City of Albuquerque, the Court held that the plaintiff could not enforce the City Charter as a condition of his employment contract.  The Court recognized that a promise which supports an implied contract could be found in written representations like an employer's policies or handbooks.  2013 WL 5554185, at *46.  Nonetheless, "[c]ourts have held that an alleged implied contract that merely restates the law does not create an implied contract."  2013 WL 5554185, at *46 (citing Peralta v. Cendant Corp., 123 F. Supp.2d 65 (D. Conn. 2000)(Arterton, J.)("The language of the anti-harassment policy that plaintiff urges as the basis of his implied contract claim does not indicate that defendant is undertaking any contractual obligations towards the plaintiff; rather, it obliges the Defendant to comply with federal and state anti-discrimination laws.")).

Promises in Hidalgo County's policies and procedures are general statements of adherence to federal and state laws; thus, "standing alone they do not create a separate and

- 79 -

independent contractual obligation." Peralta v. Cendant Corp., 123 F. Supp.2d at 65.  See

Belgrave v. City of N.Y., 1999 WL 692034, *45 (E.D.N.Y. 1999)(Gleeson, J.)(dismissing the

plaintiff's breach of contract claim where employee claimed that employer failed to follow its

procedures for providing equal opportunity to employees); Mutua v. Tex. Roadhouse Mgmt.

Corp., 2010 WL 4683859, at *14-15 (D.S.D. Nov. 10, 2010)(Schreier, J.)(granting summary

judgment on a breach-of-contract claim seeking to enforce the anti-discrimination provisions in

the employer's employee handbook, because the employer already must abide by Title VII and a

promise to perform a legal duty is not consideration for a return promise); Byra–Grzegorczyk v.

Bristol–Myers Squibb Co., 572 F. Supp. 2d 233, 254 (D. Conn. 2008)(Kravitz, J.)(recognizing

that an "anti-discrimination policy" does not indicate that an employer is undertaking any

contractual obligations towards the employee; rather, it requires the employer "to comply with

federal and state anti-discrimination laws"); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 208

(S.D.N.Y. 1998)(Jones, J.)(stating that a provision in the code of conduct requiring that all

students receive fair and equal treatment is "merely a general statement of adherence by [the

defendant] to existing anti-discrimination laws[;][i]t does not create a separate and independent

contractual obligation")(citation omitted).

The Court in Clayton v. Vanguard Car Rental U.S.A., Inc. stated its belief that "the

Supreme Court of New Mexico would not vary from this body of law, because the Supreme

Court has recognized that 'an agreement to do what one is already legally bound to do is not

sufficient consideration for the promise to another.'" 761 F. Supp. 2d 1210, 1280 (D.N.M.

2010)(Browning, J.)(citing Bank of Santa Fe v. Biava, 787 P.2d at 831)).  Furthermore, even if

Hidalgo County's policies and procedures could constitute an implied contract, the Plaintiffs

have not established that those policies did in fact create an implied contract.  The Plaintiffs

allege that Hidalgo County is already obligated to pay its employees for "hours worked and overtime" under the FLSA and NMSA.  See Complaint, ¶ 21, at 4; ¶ 24, at 5.  Because Hidalgo County already had a duty to pay the Plaintiffs under the FLSA and NMSA, representations in the employee handbook or other policies and procedures cannot form the basis of an implied contract.

### 3. The Plaintiffs' Unjust Enrichment Claim, Count IV, Could Provide a Sound Basis to Support the Plaintiffs' Collective Action.

The Plaintiffs' final state law claim, Count IV, is for unjust enrichment.  They claim that Hidalgo County "failed to pay Plaintiffs and others for all hours worked."  Complaint, ¶ 34, at 6. The Plaintiffs have statutory remedies available under the FLSA and NMSA to recover for Hidalgo County's alleged failure to compensate.  The Supreme Court of New Mexico has stated that "[t]he general equity jurisdiction of the trial court is not available . . . because appellee in fact had an adequate remedy at law."  Gen. Tel. Co. of Sw. v. State Tax Comm'n, 1962-NMSC-005, 69 N.M. 403, 408, 367 P.2d 711, 715.  See Sims v. Sims, 1996-NMSC-078, 122 N.M. 618, 624, 930 P.2d 153, 159 (stating that "equity will not act if there is a complete and adequate remedy at law"); Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1117 (10th Cir. 2005)(Murphy, J.)(finding that an equitable claim for unjust enrichment fails when the parties had remedies available at law under their contract); Strom v. Goldman, Sachs & Co., 202 F.3d 138, 144 n.6 (2d Cir. 1999)(Kaplan, J.)(finding that, when there is an adequate remedy at law, a court will not permit a claim in equity); Austin v. N. Am. Forest Products, 656 F.2d 1076, 1088-89 (5th Cir. 1981)(Johnson, J.)(finding that, when an adequate remedy at law is available, "the court may not resort to principles of equity"); Meyer v. Christie, 634 F.3d 1152, 1162 (10th Cir. 2011)(McKay, J.)(prohibiting the plaintiffs from pursuing their unjust enrichment claim unless they elect not to recover damages on their legal claims).

New Mexico law disfavors equitable actions when the plaintiffs have legal remedies available.  See Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1116-17 (discussing the preference for legal remedies over unjust enrichment claims); Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d 1244, 1271-72 (D.N.M. 2014)(Browning, J.)(finding that the Tenth Circuit's interpretation of New Mexico law, which binds the Court, "expresses a reticence to permit an unjust enrichment claim to proceed when there are contractual remedies").  Whether the Plaintiffs may pursue an equitable remedy when federal and state statutes provide legal remedies is a state law issue.  When the Supreme Court of New Mexico has not yet decided an issue, the Court's task is to predict how the Supreme Court of New Mexico would decide the issue.  See Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)("Ultimately, however, the Court's task is to predict what the state supreme court would do.")(citations omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)("The Court's task is to divine, as much as possible, what the Supreme Court of New Mexico would do if the legal question was presented to it.").  The Tenth Circuit's interpretation of New Mexico law constrains the Court's interpretation of New Mexico law.  See Abraham v. WPX Energy Prod., 20 F. Supp. 3d at 1272.

When state and federal labor laws provide a means to recover unpaid compensation, other courts have refused to allow a plaintiff's unjust enrichment claim to proceed.  See Garcia v. Tyson Foods, Inc., 766 F. Supp. 2d 1167, 1188 (D. Kan. 2011)(Lungstrum, J.)(granting summary judgment on unjust enrichment claim as duplicative of wage claims under state law)(citing Clougher v. Home Depot U.S.A., Inc., 696 F.Supp. 2d 285, 295 (E.D.N.Y. 2010)(Mauskopf, J.)(dismissing quantum meruit claims as duplicative of state statutory claim in wage and hour context)).  See Perry v. Upper Deck Co., 2007 WL 1449797, at *3 (S.D. Cal. May 11,

2007)(Burns, J.)(granting summary judgment on unjust enrichment claim where remedies were available under California Labor Code, Cal. Labor Code §§1 - 6208 (West 1989 & Supp. 2003)); Bongat v. Fairview Nursing Care Center, Inc., 341 F.Supp.2d 181, 188-89 (E.D.N.Y. 2004)(Feuerstein, J.)(dismissing quantum meruit and unjust enrichment claims in favor of statutory overtime wage law claims).

Other state courts have concluded that, even though the Plaintiffs may not ultimately prevail under the state and federal labor laws does not make their legal remedies inadequate.  In Scarpinato v. East Hampton Point Management Corp., 2013 WL 5202656 (E.D.N.Y. 2013)(Bianco, J.), the court determined that the FLSA provided plaintiffs with a remedy to pursue their claims that they had not been paid overtime wages.  2013 WL 5202656, at *2.  An administrative exemption to the overtime rule exempted the employer.  The plaintiff's FLSA claim therefore failed.  See 2013 WL 5202656, at *2.  The court found that the plaintiff's claim for payment of wages under the New York Labor Law failed for the same reason -- again, the law exempted the employer.  See 2013 WL 5202656, at *3.  Despite that both claims failed, the court dismissed the plaintiff's unjust enrichment claim because the plaintiff had an "adequate remedy at law."  2013 WL 5202656, at *3.

The Court believes New Mexico law would arrive at a different conclusion.  In Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶ 93, 276 P.3d 252 (N.M. Ct. App. 2011), the Court of Appeals of New Mexico determined that the existence of a statutory remedy did not automatically foreclose an equitable remedy that addresses the same claim unless the statute "provides with express language or necessary implication" that the New Mexico Legislature intended to foreclose traditional equitable remedies.  2012-NMCA-053, ¶ 93, 276 P.3d 252 (citing Sims v. Sims, 1996-NMSC-078, ¶ 33).  In New Mexico, "[t]here is no

requirement that the creation of a statutory remedy at law for a particular type of claim will automatically supplant an equitable remedy that addresses the same claim." Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶ 93.  Similarly, the Court found that, under New Mexico law, if a plaintiff could not pursue his breach-of-contract claim for some reason, the existence of a legal remedy would not automatically bar the unjust enrichment claim. Abraham v. WPX Energy Prod., 20 F. Supp. 3d at 1276 (citing Danley v. City of Alamogordo, 1978-NMSC-031, 91 N.M. 520, which allowed a plaintiff to pursue an unjust enrichment claim only because his contract claim was not viable).

Here, both federal and state statutes govern the parties' relationship regarding the dispute. Both statutes expressly impose requirements on employers regarding payment to employees. The Plaintiffs therefore have statutory remedies available to them for the wage and hour violations underlying their unjust enrichment claims.  Under New Mexico law, however, the Plaintiffs may pursue equitable remedies unless the statute "provides with express language or necessary implication" that the New Mexico Legislature intended to foreclose traditional equitable remedies.  2012-NMCA-053, ¶ 93.  Neither the FLSA nor state wage-and-hour laws provide any such indication.  Consequently, the Plaintiffs may pursue their unjust enrichment claims.

Although the Court does not conclusively decide the merits of these claims in this motion, it must examine the claims to "make a meaningful determination of the certification issues," Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d at 1234, and determine whether the state law claims could support a rule 23 action.  Should the Court grant the Defendants' Motion for Summary Judgment on the Plaintiffs' FLSA claims, however, the Plaintiffs would only have state law claims before this court, depriving the Court of federal subject matter jurisdiction.  See

Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1167 (10th Cir. 2004)(holding that the federal district court's dismissal of the plaintiffs' federal claims deprived the court of its jurisdiction over the remaining state law claims arising from the same incident).[11] Regardless of the resolution of the state law claims, however, the Plaintiffs have not at this time demonstrated that they satisfy rule 23(a) and 23(b)'s requirements.

**IT IS ORDERED** that the requests in the Plaintiffs' Motion for Conditional Certification of a Collective Action Under 29 U.S.C. § 216(b) and Certification of a Class Action Under Fed. R. Civ. P. 23(b)(3) and Memorandum in Support, filed September 30, 2014 (Doc. 33), are granted in part and denied in part. The Court grants the motion to certify the Plaintiffs' claims under the federal Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219. It denies the Plaintiffs' motion to certify their state law claims under rule 23 of the Federal Rules of Civil Procedure without prejudice to allow them to renew the motion later.

_____
UNITED STATES DISTRICT JUDGE

---

[11]The Class Action Fairness Act, 28 U.S.C. §1332 ("CAFA"), gives federal courts jurisdiction over cases where only minimal diversity exists, so long as "the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1348 (quoting 28 U.S.C. § 1332(d)(2)). See Woods v. Standard Ins. Co., 771 F.3d 1257, 1261 (10th Cir. 2014). CAFA does not apply to this case, where the parties did not invoke CAFA or establish that (i) the amount in controversy exceeds $5 million, or (ii) the class has more than 100 members.

*Counsel*:

Shane C. Youtz
James A. Montalbano
Stephen Curtice
Youtz & Valdez, P.C.
Albuquerque, New Mexico

  *Attorneys for the Plaintiffs*

Agnes F. Padilla
Felicia C. Boyd
Butt Thornton & Baehr, P.C.
Albuquerque, New Mexico

  *Attorneys for the Defendant*