IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MADONNA BUSTILLOS, FRANCISCO
CONTRERAS, CONCEPCION T.
HERNANDEZ, MARTHA S. JIMENEZ and
AMANDA VOGELSANG-WOLF, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

vs.                                     No. CIV 13-0971 JB/GBW

BOARD OF COUNTY COMMISSIONERS OF
HIDALGO COUNTY,

        Defendant.

**MEMORANDUM OPINION[1]**

     **THIS MATTER** comes before the Court on Defendant Board of County Commissioners

of the County of Hidalgo's Motion and Memorandum for Summary Judgment on All of Plaintiff

Amanda Vogelsang-Wolf's Claims, filed November 12, 2014 (Doc. 41)("MSJ").  The Court held

a hearing on April 29, 2015.  The primary issues are: (i) whether Plaintiff Amanda Vogelsang-

Wolf has produced evidence from which the Court can draw a reasonable inference of the

uncompensated hours she worked; (ii) whether Hidalgo County had actual or constructive

knowledge that Vogelsang-Wolf performed uncompensated work; (iii) whether Vogelsang-

Wolf's pre- and post-shift work is compensable under the Fair Labor Standards Act of 1938, 29

U.S.C. §§ 201-219 ("FLSA"); (iv) whether Vogelsang-Wolf's pre- and post-shift work is de

minimis under the FLSA; (v) whether Vogelsang-Wolf's on-call work is compensable under the

---

[1]The Court entered an earlier Order granting the Defendant's MSJ on all of the Plaintiffs'
claims.  See Order, filed September 2, 2015 (Doc. 59)("Order").  The Court stated that it would
"at a later date issue a memorandum opinion more fully detailing its rationale for this decision."
Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

FLSA; (vi) whether Vogelsang-Wolf can use § 50-4-2(b) of the New Mexico Statutes to sue a public employer; (vii) whether Vogelsang-Wolf's implied-contract claim can prevail when federal and state statutes form the basis of the contract; and (viii) whether Vogelsang-Wolf's unjust-enrichment claim can proceed when Vogelsang-Wolf has other legal remedies available. The Court grants the MSJ as to Count Two of the Complaint for Violations of the Fair Labor Standards Act, State Wage and Hour Laws, Breach of Contract and Unjust Enrichment Collective Action Complaint (29 U.S.C. § 216(b)), filed October 8, 2013 (Doc. 1), because: (i) Vogelsang-Wolf does not present sufficient evidence to meet her burden of proof under the FLSA concerning the number of overtime hours worked; (ii) the FLSA does not, as a matter of law, require Hidalgo County to compensate Vogelsang-Wolf for her pre- and post-shift work, but her pre-shift briefings may be compensable; (iii) the FLSA does not require Hidalgo County to compensate Vogelsang-Wolf for her pre- and post-shift work, because the work is de minimis; and (iv) the FLSA does not require Hidalgo County to compensate Vogelsang-Wolf for her on-call work.  The Court therefore grants the MSJ as to the Plaintiffs' federal claims in Count Two. The Court declines to exercise supplemental jurisdiction over Vogelsang-Wolf's state law claims and therefore dismisses Counts One, Three, and Four without prejudice.

## FACTUAL BACKGROUND

Vogelsang-Wolf and the other proposed class members are correctional officers, sergeants, and lieutenants at the Hidalgo County Detention Center in Lordsburg, New Mexico. See Complaint ¶ 1, at 1-2; id. ¶¶ 8-10, at 2-3.  Vogelsang-Wolf's duties included "supervisory duties relating to the entry, incarceration, safety and release of persons committed to the Detention Center."  MSJ ¶ 3, at 2 (setting forth this fact).  See Response ¶ 3, at 1 (not disputing this fact).  At the beginning of each shift, detention officers met in the control room to conduct a

briefing, check equipment, account for keys, and document the pass-down log.  See MSJ ¶ 11, at 3 (setting forth this fact); Response ¶ 11, at 2 (not disputing this fact).  Employees kept time sheets to record the time that they worked.  See MSJ ¶ 13, at 3 (setting forth this fact); Response ¶ 13, at 2 (not disputing this fact).  The log documented when some employees arrived early or late, but it did not document "the arrival and departure of *every* employee on *every* shift."  Response ¶ 12, at 2 (not disputing this fact).  See MSJ ¶ 12, at 3 (setting forth this fact).  The log "is an unreliable gauge of the exact start times of Plaintiff Wolf or every other detention employee."  Response ¶ 12, at 2.

Vogelsang-Wolf's typical shift was from 7:00 a.m. to 7:00 p.m.  See MSJ ¶ 10, at 3 (setting forth this fact); Response ¶ 10, at 2 (not disputing this fact).  Hidalgo County did not have a written policy requiring employees to arrive early.  See Response ¶ 1, at 5 (setting forth this fact); Defendant Hidalgo County's Reply in Support of Motion for Summary Judgment on Plaintiff Amanda Vogelsang-Wolf's Claims ¶ 1, at 5, filed January 9, 2015 (Doc. 51)("Reply")(not disputing this fact).  Employees discovered that they should arrive early for briefings by "word of mouth" and "common knowledge."  Response ¶ 1, at 5 (setting forth this fact).  See Reply ¶ 1, at 5 (not disputing this fact).  The briefings lasted from two to fifteen minutes "depending on what happened."  MSJ ¶ 15, at 3-4 (setting forth this fact).  See Response ¶ 15, at 3 (not disputing this fact).  Even when the briefings began before the shift, Hidalgo County compensated officers when their shift began.  See MSJ ¶¶ 14-15, at 3-4 (setting forth this fact); Response ¶¶ 14-15, at 3 (not disputing this fact).  Detention Center Director Dolly Ward acknowledged that outgoing and incoming shifts overlap.  See Response ¶ 5, at 5 (setting forth this fact); Reply ¶ 5, at 6 (not disputing this fact).

"Vogelsang-Wolf arrived to work early in the 'beginning' of her employment with Hidalgo County." MSJ ¶ 17, at 4 (setting forth this fact).[2] Hidalgo County did not discipline any employees for not arriving early to their posts. See Response ¶ 16, at 3.[3] Employees could be disciplined for arriving late. See Response ¶ 7, at 5 (setting forth this fact); Reply ¶ 7, at 6 (not disputing this fact).

Hidalgo County never advised Vogelsang-Wolf to inaccurately report her time. See MSJ ¶ 21, at 4 (setting forth this fact); Response ¶ 21, at 3 (not disputing this fact). She always

---

[2]Vogelsang-Wolf does not dispute that she arrived early in the beginning of her employment. The Local Rules of Civil Procedure state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b). Vogelsang-Wolf cites to her deposition testimony to suggest that she arrived at least five minutes early for briefings not only in the beginning, but throughout her employment. See Response ¶ 17, at 3. The evidence does not, however, substantiate this contention. Vogelsang-Wolf's testimony indicates that she and other officers did not consistently arrive early; she agreed that officers arrived "right on time" and were not disciplined. Deposition of Amanda Vogelsang-Wolf at 79:21-80:6 (taken August 19, 2014)(Padilla, Vogelsang-Wolf)(Doc. 41-2)("Vogelsang-Wolf Depo."); id. at 155:5-7 (Vogelsang-Wolf). Because Vogelsang-Wolf introduces no evidence demonstrating that she or other officers consistently arrived early for briefings, the Court concludes that there is undisputed evidence to support the material fact that Vogelsang-Wolf arrived early for work only in the beginning of her employment. See D.N.M.LR-Civ. 56.1(b).

[3]Vogelsang-Wolf disputes whether Hidalgo County disciplined employees for not arriving early. Because she has no evidence to suggest Hidalgo County disciplined employees for not arriving early, she does not argue that Hidalgo County disciplined employees for not arriving early. Rather, she contends that she was not aware of discipline. See Response ¶ 16, at 3. It is therefore undisputed that Vogelsang-Wolf was not aware that Hidalgo County disciplined any employees for failing to arrive early, and there is no evidence that Hidalgo County disciplined any employees for not arriving early. Thus, for the purpose of this motion, the Court can say that Hidalgo County did not discipline any employees for not arriving early.

accurately recorded her time "to the minute."   MSJ ¶ 19, at 4 (setting forth this fact).   See Response ¶¶ 18-19 (not disputing this fact).   Vogelsang-Wolf contends that, even though she always accurately recorded her time "to the minute," Hidalgo County would not pay her for time in which she participated in briefings before her shift began.   Response ¶¶ 18-20, at 3.   Hidalgo County implemented a rounding policy in which it would round the employee's work time to the nearest quarter of an hour on his or her time sheets.   See MSJ ¶ 22, at 4 (setting forth this fact); Response ¶ 22, at 4 (not disputing this fact).   Vogelsang-Wolf "submitted separate overtime sheets requesting compensation for overtime work she performed."   MSJ ¶ 23, at 4 (setting forth this fact).   See Response ¶ 23, at 4 (not disputing this fact).   Throughout her employment, Hidalgo County may have rejected only one overtime request, which "may have been for 'like 15 minutes' or maybe it was not that much time.'"   MSJ ¶ 24, at 4-5 (setting forth this fact)(quoting Vogelsang-Wolf Depo. at 73:13-74:13).   See Response ¶ 24, at 4 (not disputing this fact).   If Vogelsang-Wolf worked overtime, she "made sure" Hidalgo County compensated her for it. MSJ ¶ 25, at 5 (setting forth this fact).   See Response ¶ 25, at 4 (not disputing this fact).

Vogelsang-Wolf was also "on call" during some of the time that she worked for Hidalgo County.   Hidalgo County would place her and several other officers on call for a two-week rotation.   See MSJ ¶ 26, at 5 (setting forth this fact); Response ¶ 26, at 4 (not disputing this fact). On-call periods prevented Vogelsang-Wolf from leaving town or drinking alcohol.   See MSJ ¶ 27, at 5 (setting forth this fact); Response ¶ 27, at 4 (not disputing this fact).   Vogelsang-Wolf could spend her on-call time at home; she did not need to be in or near the Detention Center.   See MSJ ¶ 28, at 5 (setting forth this fact); Response ¶ 28, at 4 (not disputing this fact).   When Vogelsang-Wolf was unavailable while on call, Hidalgo County did not formally discipline her. See MSJ ¶ 31, at 5 (setting forth this fact); Response ¶ 31, at 4 (not disputing this fact).   When

Vogelsang-Wolf came to work during her on-call time, Hidalgo County compensated her for one full hour "whether she worked fifteen minutes or an hour."  MSJ ¶ 32, at 5 (setting forth this fact).  See Response ¶ 32, at 4 (not disputing this fact).  When Vogelsang-Wolf helped resolve an issue over the telephone, Hidalgo County did not compensate her.  See Response ¶ 13, at 6 (setting forth this fact); Reply ¶ 3, at 6 (not disputing this fact).  In the five years in which Vogelsang-Wolf was on call, she estimates that she returned to work five to ten times.  See MSJ ¶ 32, at 6 (setting forth this fact); Response ¶ 32, at 4 (not disputing this fact).

## PROCEDURAL BACKGROUND

The Plaintiffs filed suit in federal court on October 8, 2013.  See Complaint at 1.  They allege four causes of action: (i) violation of the New Mexico state wage and hour laws, N.M. Stat. Ann. § 50-4-1 to -30, see Complaint ¶¶ 20-22, at 4; (ii) violations of the FLSA, see Complaint ¶¶ 23-27, at 4-5; (iii) breach of their employment contracts, see Complaint ¶¶ 28-31, at 5; and (iv) unjust enrichment, in the form of free hours worked, see Complaint ¶¶ 32-36, at 5-6.  The Plaintiffs demand a jury trial, see Complaint ¶ 37, at 6, and ask that the case proceed as a "collective action" under 29 U.S.C. § 216(b), and that they receive compensatory and liquidated damages, including pre- and post-judgment interest, and costs and attorneys' fees, Complaint ¶¶ a-f, at 6.

The Plaintiffs filed a Motion to Certify Class on behalf of Plaintiffs Martha S. Jimenez and Amanda Vogelsang-Wolf on September 30, 2014.  See Motion to Certify Class at 1, filed September 30, 2014 (Doc. 33)("Motion").  They requested that the Court "conditionally" certify Count II, the FLSA claim, as a collective action under 29 U.S.C. § 216(b) and that the Court certify the other three claims as a class action under rule 23(b)(3).  Motion at 3, 7.  The Court conditionally certified the case as a collective action under the FLSA's § 216(b).  See

Memorandum Opinion and Order, filed September 16, 2015 (Doc. 60)("MOO").  Because the Plaintiffs had not at that time put forth sufficient facts showing the proposed class' compliance with rules 23(a) and 23(b), the Court denied the request for class certification without prejudice, to all them to renew their motion later when and if they could support it with evidence.  See MOO at 85.

Hidalgo County filed its MSJ on November 12, 2014.  See MSJ at 1.  It argues for summary judgment on all of Vogelsang-Wolf's claims.  First, it argues that Vogelsang-Wolf cannot meet her burden of proving the amount of unpaid overtime work she allegedly performed. See MSJ at 8-10.  In FLSA actions for overtime, plaintiffs bear the burden of proof to establish the number of overtime hours worked and the amount of wages due.  See MSJ at 9.  Hidalgo County argues that Vogelsang-Wolf cannot meet her burden of proof.  MSJ at 9.  Hidalgo County asserts that Vogelsang-Wolf's testimony alone is insufficient to meet her burden of proof.  See MSJ at 10-11.  Moreover, Hidalgo County contends that even if Vogelsang-Wolf did perform overtime work, Hidalgo County had no knowledge of it and therefore the Court should dismiss her claims.  See MSJ at 19-20.

Hidalgo County next argues that Vogelsang-Wolf's pre-shift work is not compensable under the FLSA as a matter of law.  See MSJ at 11.  Specifically, Hidalgo County argues that the Portal-to-Portal Act excludes from compensation certain preliminary and postliminary activities. See MSJ at 12.  Although mandatory pre-shift briefings may constitute the basis for an FLSA overtime violation in some instances, Hidalgo County argues that Vogelsang-Wolf cannot recover for two reasons.  First, Vogelsang-Wolf's pre-shift activities are not compensable because they are not essential to her principal tasks at the Detention Center.  See MSJ at 14.

Second, Vogelsang-Wolf's pre-shift work constitutes de minimis work that takes only a few extra minutes to perform. See MSJ at 14-15.

Next, Hidalgo County argues that Vogelsang-Wolf's on-call "claims are precluded as a matter of law." MSJ at 16. It asserts that case law and Department of Labor regulations demonstrate that time spent on-call may be compensable only when the employee is "on duty." MSJ at 16-17. Hidalgo County states that, when employees are on-call while "off duty," like Vogelsang-Wolf, they cannot obtain compensation under the FLSA. MSJ at 17. Finally, Hidalgo County asserts the Plaintiffs' three state law claims cannot proceed. See MSJ at 20. Although Count One alleges violations of New Mexico statutory law, Hidalgo County argues that the provisions the Plaintiffs cited do not apply to it, because it is a public employer. See MSJ at 20-21. It states that Count Three, the breach-of-contract claim, is likewise invalid, because "'an agreement to do what one is already legally bound to do is not sufficient consideration for the promise to another.'" MSJ at 22 (quoting Salazar v. City of Albuquerque, 2013 WL 5554185, at *46 (D.N.M. Aug. 20, 2013)(Browning, J.)). It argues that Count Four, for unjust enrichment, is derivative of the FLSA claim, because Hidalgo County's enrichment is unjust only because of the alleged FLSA violations. See MSJ at 22.

The Plaintiffs responded on December 11, 2014. See Plaintiffs' Response to Defendant's Motion and Memorandum for Summary Judgment on All of Plaintiff Amanda Vogelsang-Wolf's Claims, filed December 11, 2014 (Doc. 49)("Response"). Vogelsang-Wolf does not clearly argue that she meets her burden to establish the number of overtime hours she worked. See Response at 8. Rather, she asserts that the time she worked was mandatory. See Response at 8-9. Second, she argues that Hidalgo County knew she performed overtime because the Detention Center's policies required pre-shift briefings. See Response at 13. Third, she asserts that the

FLSA compensates the pre-shift work she performed because it could have been required.  See Response at 9-10.  She argues that "a factual dispute exists with respect to whether the pre-shift briefing period was in fact mandatory," so the Court must deny summary judgment.  Response at 10.  Fourth, she argues that the pre- and post-shift work was not de minimis because it was required.  See Response at 10.  Finally, she asserts that her on-call time required her to give up various freedoms, making it compensable.  See Response at 12.

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week.  See 29 U.S.C. §§ 206-207.  The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual civil causes of action to recover unpaid minimum wages, overtime compensation and certain liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217.  "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

1.      __The FLSA's Minimum Wage, Overtime, and Records Requirements__.

The FLSA's § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."  29 U.S.C. § 207(a)(1).  "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'"  Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.).  The United States Court of Appeals for the Tenth Circuit has recognized "that a contract cannot designate an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate."  Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work."  29 U.S.C. § 203(g). See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.'  The act, however, contains no definition of 'work.'").  "'The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's.'"  United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(quoting Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)).  The Supreme Court of the United States of America has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued

necessarily and primarily for the benefit of the employer and his business."  Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)).  The Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.  Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

The FLSA's § 6 requires employers to pay their employees a minimum wage.  See 29 U.S.C. § 206(a).  Deductions from employees' paychecks, for whatever reason, that brings the employees' pay under the minimum wage violates § 6.  See Donovan v. Simmons Petrol. Corp., 725 F.2d at 84 (holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation).  Cf. Dole v. Solid Waste Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(finding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA).  Additionally, the FLSA's § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain.  29 U.S.C. § 211(c).  In Donovan v. Simmons Petroleum Corp., the Tenth Circuit

recognized the employers' duty under the FLSA to keep accurate records in discussing the shift of the burden to prove damages between the employee and the employer:

> The employee bears the burden of proving he performed work for which he was not properly compensated.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).  However, employers have a duty to keep accurate records. If employers do not keep accurate records the employee's burden is extremely difficult.   In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in Anderson that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Id.  Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate.   The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law.  Id. at 687-88.

Donovan v. Simmons Petroleum Corp., 725 F.2d at 85-86.  The federal Department of Labor's Wage and Hour Division requires that employers must maintain in the records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the employee in any week in which overtime compensation is due, hours worked each workday and workweek, total daily or weekly straight-time earned, and total overtime.  See 29 C.F.R. § 516.2(a).  Where an employer violates its § 211(c) record-keeping duties, including by not counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees.  See U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and

postshift hours worked."); <u>Metzler v. IBP, Inc.</u>, 127 F.3d 959, 965–66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ].").

Section 7(a) sets forth the general rule for calculating overtime.   <u>See</u> 29 U.S.C. § 207(a)(1).  Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by section 7(a)."  29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  <u>See</u> 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is actually employed.").  The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he works in excess of forty in a given week.

One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest.  If not more than the maximum hours prescribed in the Act

are actually worked in the workweek, overtime pursuant to section 7(a) need not
be paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay

overtime for those hours does not relieve an employer from paying overtime for them if the

contract of employment demands them.  See 29 C.F.R. § 778.102.

For the purposes of calculating overtime under the FLSA, however, the only concern is

whether the total hours worked in a given workweek are above or below the statutory

requirement for overtime compensation.  See 29 C.F.R. § 778.102.  A second important principle

about calculating overtime under the FLSA is that the employee must receive overtime pay at a

rate of no less than one and one-half times the "regular rate" for which the employer employs the

employee.  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The

keystone of Section 7(a) is the regular rate of compensation.").  The Supreme Court described

"the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime

workweek for which he is employed."  Walling v. Youngerman-Reynolds Hardwood Co., 325

U.S. at 424.  Since the Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co.,

Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C. § 207(e)

("[T]he 'regular rate' at which an employee is employed shall be deemed to include all

remuneration for employment paid to, or on behalf of, the employee," with eight statutory

exceptions),[4] and the interpretive bulletins have incorporated the Supreme Court's definition, see

---

[4]The FLSA now contains a description of what is included in the regular rate, but still
contains no definition precisely setting forth how it is calculated.  See Scott v. City of New York,
592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not
defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. at 40)(internal
quotation marks omitted)).

29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'"). Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part.  See 29 C.F.R. § 779.108.

### 2.     Compensable Time Under the FLSA.

Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, to define certain activities that employers need not compensate pursuant to the FLSA.[5]  The Portal-to-Portal Act excludes from compensation certain preliminary and postliminary activities, like pre-shift walking and, in some cases, changing clothes and putting on specific gear.  See Steiner v. Mitchell, 350 U.S. 247, 252 (1956); Reich v. IBP, Inc., 38 F.3d 1123, 1126 (10th Cir. 1994)(holding that the donning and doffing of safety glasses, ear plugs, a hard hat, and safety shoes are non-compensable preliminary and postliminary activities).  Under Department of Labor regulations explaining the Portal-to-Portal Act, see 29 C.F.R. § 790.6 (1947), the workday

---

[5]The Portal-to-Portal Act provides:

[N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . --

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(emphasis added).

begins with the "first principal activity" and ends with the last, see IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005).

The Supreme Court clarified what constitutes a "principal activity" in IBP, Inc. v. Alvarez. See 546 U.S. at 34. It held that anything that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act, which makes it compensable. 546 U.S. at 37. The Supreme Court noted that, to the extent that standard protective clothing and gear are "integral and indispensable" to a principal activity, the donning and doffing of those items are principal activities and are therefore compensable. 546 U.S. at 36-37. Accordingly, the key issue to determining compensability is whether the pre-shift activities are integral and indispensable to the employee's principal activities. See Lindow v. United States, 738 F.2d 1057, 1060 (9th Cir. 1984)(Choy, J.)(finding that pre-shift activities may be compensable if they are an "integral and indispensable" part of the principal activities).

The Tenth Circuit has interpreted what constitutes preliminary, non-compensable activities. In Smith v. Aztec Well Servicing Co., 462 F.3d 1274 (10th Cir. 2006), the plaintiffs argued that they were entitled to compensation for time spent loading their trucks with safety and protective gear, then traveling to the job site. See 462 F.3d at 1276-77. The Tenth Circuit acknowledged that, if the plaintiffs' first principal activity -- loading their trucks with protective gear -- occurred before traveling to the job site, then the plaintiffs' travel time constituted compensable work. 462 F.3d at 1289. Nonetheless, the Tenth Circuit explained that, where

> an employee's activity "takes all of a few seconds and requires little or no concentration," then the activity is "properly considered not work at all." Moreover, "[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no different from having a baseball player show up in uniform, . . . or a judge with a robe." It is simply a prerequisite for the job, and is purely preliminary in nature.

- 16 -

> Consequently, the plaintiffs' travel to and from the well sites was not integral and indispensable to their principal activities merely because they were required to carry their personal safety equipment along with them.

462 F.3d at 1289 (quoting Reich v. IBP, Inc., 38 F.3d at 1125, 1126 n.1).  In arriving at its decision that loading protective gear into the truck was not integral and indispensable to the plaintiffs' job, the Tenth Circuit considered the amount of time it took and the level of concentration.  The safety equipment was clearly required to do the job, yet the Tenth Circuit still found that it was not integral and indispensable to the employees' principal activities.  Similarly, in Reich v. IBP, Inc., the Tenth Circuit held that putting on safety glasses, ear plugs, a hard hat, and safety shoes was not compensable, because it "requires little or no concentration," and can easily be done while focusing on other things.  38 F.3d at 1126.  "Thus, although essential to the job, and required by the employer, any time spent on these items is not work."  38 F.3d at 1126.  In contrast, putting on special protective gear that was "heavy and cumbersome," and required "physical exertion, time, and a modicum of concentration to put them on securely and properly," was compensable, as this donning differed in kind rather than merely degree.  38 F.3d at 1126.

Because mandatory pre-shift briefings may be integral and indispensable to an employee's principal activities, they may form the basis of an FLSA overtime violation.  That "certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable,'" however.  IBP, Inc. v. Alvarez, 546 U.S. at 40.  An activity is integral and indispensable if it is an "intrinsic element" of the employee's principal activities, and one with which the employee cannot dispense if he or she is to perform his or her principal activities.  See Integrity Staffing Solutions, Inc. v. Busk,

135 S. Ct. 513, 514 (2014).  Consequently, the Supreme Court has held that time spent waiting to don protective gear is not compensable, while time spent sharpening knives at a meatpacking plant was compensable, as dull knives would slow the assembly line production, cause waste, lead to accidents, and "affect the appearance of the meat as well as the quality."  135 S. Ct. at 518 (quoting Mitchell v. King Packing Co., 350 U.S. 260, 262 (1956)).  In other words, the employees could not perform their jobs adequately without sharpening their knives.

Recently, the Supreme Court held that time spent undergoing mandatory security screenings were not compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518.  T the Supreme Court stated that, although the employer required employees to undergo the screenings, the screenings were not integral and indispensable to the principal task they were paid to perform -- stocking warehouse shelves and packaging products.  See 135 S. Ct. at 519.  Importantly, the Supreme Court stated that the "Court of Appeals erred by focusing on whether an employer *required* a particular activity.  The integral and indispensable test is tied to the productive work that the employee is *employed to perform*."  135 S. Ct. at 519 (emphasis in original).  Moreover, the Supreme Court held that it was not determinative whether the task benefitted the employer.  See 135 S. Ct. at 519.

> [I]t is not enough to make an activity compensable under the Fair Labor Standards Act that the employer requires it and it is done for the benefit of the employer. Even activities required by the employer and for the employer's benefit are "preliminary" or "postliminary" if not integral and indispensable to "the productive work that the employee is *employed to perform*."

Balestrieri v. Menlo Park Fire Prot. Dist., 2015 WL 5166732, *5 (9th Cir. 2015)(Kleinfeld, J.)(quoting Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519).

- 18 -

Finally, the Supreme Court reaffirmed its statement that, if the employee need not perform a task before every shift or the task can be eliminated altogether, it is not integral and indispensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 513 (finding that an activity was not integral and indispensable when the employees did not participate in them every day); id. at 518 (finding that activities were not integral and indispensable if the employer could have eliminated the required practice without impairing the employees' ability to complete their work).   Unlike activities that are "*always* essential if the worker is to do his job," certain activities "may or may not be necessary in particular situations or for every employee."  IBP, Inc. v. Alvarez, 546 U.S. at 40.  When certain tasks are not necessary, the activity "comfortably qualif[ies] as a 'preliminary' activity."  IBP, Inc. v. Alvarez, 546 U.S. at 40.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)

(emphasis in original).[6]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."   Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his

---

[6]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

complaint, but must respond with specific facts showing the existence of a genuine factual issue

to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations

unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123

JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross &

Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In

responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on

speculation, or on suspicion and may not escape summary judgment in the mere hope that

something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1

(quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will

not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the

fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448

(1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If

the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may

be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a

rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.

Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[7]] explained that the

---

[7]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"    Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id.
> at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

---

> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller, Sarmiento v. City and Cnty. of Denver, 82 F.3d 426 (10th Cir.
1996), and Whitaker v. Pacific Enter. Oil Co., 956 F.2d 1170 (10th Cir. 1992) have persuasive
value with respect to material issues, and will assist the Court in its preparation of this
Memorandum Opinion and Order.

sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## ANALYSIS

The Court will grant Hidalgo County's MSJ as to all of the Complaint's federal claims. Because no federal claims remain after the Court dismisses Count Two, the Court declines to exercise supplemental jurisdiction over the remaining state law claims -- Counts One, Three, and Four.  The Court dismisses Vogelsang-Wolf's state law claims without prejudice to allow her to raise them in state court.

## I.   VOGELSANG-WOLF DOES NOT DEMONSTRATE THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING WHETHER THE FLSA COMPENSATES HER ALLEGED WORK, AND HIDALGO COUNTY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Vogelsang-Wolf asserts that Hidalgo County failed to pay her overtime under the FLSA for pre- and post-shift work, and for time spent on call.  Vogelsang-Wolf does not present enough evidence for the Court to draw a reasonable inference of the hours for which she seeks overtime compensation.  Even if she could show the hours for which she demands compensation, Hidalgo County need not, as a matter of law, compensate her under the FLSA for time spent reading post orders and inspecting equipment, and the time spent performing all her pre- and post-shift work involved a de minimis amount of time.

### A.   VOGELSANG-WOLF DOES NOT, AS A MATTER OF LAW, SATISFY HER BURDEN OF PROVING UNPAID OVERTIME WORK.

In an FLSA action for unpaid overtime wages, the plaintiff-employee generally bears the burden of proof to establish, by a preponderance of the evidence, the number of hours of overtime worked each week and the wages due per pay period.  See Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 686-87; Wirtz v. Lieb, 366 F.2d 412, 414 (10th Cir. 1966)(Murrah, J.); Mitchell v. Caldwell, 249 F.2d 10, 11 (10th Cir. 1957)(Bratton, J.); Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984); Brubach v. City of Albuquerque, 893 F. Supp. 2d 1216, 1224 (D.N.M. Sept. 27, 2012)(Vazquez, J.); Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273, 1284 (D. Kan. 2012)(Marten, J.).  When an employer's payroll records are unreliable, an employee can meet his burden of proof by (i) showing that the plaintiff "in fact performed work for which he was improperly compensated;" and (ii) "[producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Baker v. Barnard Const. Co., Inc., 146 F.3d 1214, 1220 (10th Cir. 1998)(McKay, J.)(citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 686-88).  See Brubach v. City of Albuquerque, 893 F. Supp. 2d at 1224 (citing Sedano v. Mercado, 1992 WL 454007, at *3 (D.N.M. Oct. 8, 1992)(Bratton, J.)).

Hidalgo County did not misreport time records or encourage employees to do so.  See MSJ ¶ 21, at 4; Response ¶ 21, at 3.  Vogelsang-Wolf and everyone else that she knew correctly reported their time.  See MSJ ¶¶ 18-20, at 4; Response ¶¶ 18-20 at 3; Vogelsang-Wolf Depo. at 66:17-23 (Vogelsang-Wolf).  Hidalgo County never gave her anything stating that she would not be paid overtime; it did not discourage her from accurately reporting her time.  See MSJ ¶ 21, at 4; Response ¶ 21, at 3; Vogelsang-Wolf Depo. 67:11-12 (Vogelsang-Wolf).  Even if Hidalgo County's records were unreliable, Vogelsang-Wolf does not present "sufficient evidence to show

the amount and extent of [uncompensated] work as a matter of just and reasonable inference."

Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 687.

To satisfy Vogelsang-Wolf's burden of proof, she need not establish the number of overtime hours worked with concrete certainty, but she must present sufficient evidence to create a "just and reasonable inference" that she worked the time alleged.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 686-87.  See Metzler v. IBP, Inc., 127 F.3d 959, 965 (10th Cir. 1997). At a minimum, an FLSA complaint must set forth the approximate number of unpaid regular and overtime hours allegedly worked.  See Dejesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 89 (2d Cir. 2013).  For example, in Mitchell v. Caldwell, the plaintiff kept "a daily record of hours worked" until he stopped working for his employer.  249 F.2d at 11-12.  "[I]t furnished a basis for ascertaining by mathematical calculation the average amount of overtime worked per week." 249 F.2d at 12.  Similarly, in Bowe v. SMC Electric Products, Inc., 916 F. Supp. 1066, 1072-73 (D. Colo. 1996)(Kane, J.), the plaintiff employee kept records on a calendar and a day timer. The district court found these records sufficient to allow the court to draw a just and reasonable inference of the overtime hours that the plaintiff worked.  See 916 F. Supp. at 1073.

In contrast, in Courtright v. Board of County Commissioners of Payne County, Oklahoma, 2011 WL 2181954 (W.D. Okla. June 3, 2011)(DeGiusti, J.), the court concluded that the employees' testimony alone did not set forth sufficient evidence to support their claims.  See 2011 WL 2181954, at *10.  The first plaintiff testified that he worked five unscheduled hours per period and that he attended unscheduled trainings. See 2011 WL 2181954, at *10.  The second plaintiff, also relying on testimony alone, asserted that she "generally worked a double shift every two months and was required to stay past a scheduled shift for a few additional hours twice a month." 2011 WL 2181954, at *10.  The trial court found that their testimony, without other

facts or evidence, was insufficient to "support a reasonable finding that [they] worked overtime hours."  2011 WL 2181954, at *10.  See Brown v. ScriptPro, LLC, 700 F.3d 1222, 1230 (10th Cir. 2012)(Kelly, J.)(finding that, even though the plaintiff employee demonstrated he worked overtime, he failed to show the amount of overtime by just and reasonable inference).

The evidence that Vogelsang-Wolf offers does not, as a matter of law, allow the court to draw a just and reasonable inference of the hours worked.  First, she brings no documentation establishing the amount of overtime she allegedly performed.  See Response ¶ 12, at 2 (conceding that the control room log "is an unreliable gauge of the exact start times of Plaintiff Wolf or every other detention employee").  In cases where the courts have relied on a plaintiff's testimony to establish the time worked, the plaintiff has been able to establish a consistent pattern of overtime work from which the court could infer the number of hours.  The plaintiffs in these cases have also proffered other evidence to support their testimony.  See Riley v. Town of Basin, 961 F.2d 220, 1992 WL 86717, at *5 (10th Cir. 1992)(Moore, J.)(finding that an employee's time sheets and diary notations reflecting his overtime hours, in addition to his testimony, supported a just and reasonable inference of the time worked).

For example, in Garcia v. Tyson Foods, Inc., the plaintiffs introduced a highly detailed "time study," in which six professional videographers measured the amount of time that employees spent performing tasks for which they sought overtime compensation over the course of three days.  See 890 F. Supp. 2d at 1284-85.  The court noted that, "[w]hile the testimony of the five plaintiffs alone likely would not have been sufficient to sustain the jury's verdict, when coupled with the evidence of the time study . . . and the damages figures calculated" by a professional, the evidence was sufficient to show the amount of overtime the plaintiffs worked. 890 F. Supp. 2d at 1285. Here, Vogelsang-Wolf's testimony: (i) provides little sense of how

many hours of uncompensated work she performed; (ii) does not establish a consistent pattern of overtime from which the court could infer her overtime hours; and (iii) has changed throughout the litigation.  Here, Vogelsang-Wolf's testimony provides little sense of how many hours of uncompensated work she performed.

Vogelsang-Wolf's testimony is not specific enough to allow the Court to infer her overtime hours by just and reasonable inference.  Vogelsang-Wolf argues that her testimony is specific, because she argues the pre-shift briefings took "between five to fifteen minutes." Response at 9 (citing Motion at 4).  This statement, however, neglects that the briefings did not begin until the shift began in some cases, and two to five minutes early in other cases.  See MSJ ¶ 15, at 3-4; Response ¶ 15, at 3.  Hidalgo County paid employees the moment their shift began. See MSJ ¶¶ 14-15, at 3-4; Response ¶¶ 14-15, at 3.  Thus, Vogelsang-Wolf's testimony does not allege with any precision how many minutes during the briefing were unpaid.  Her testimony suggests it varied depending on when the officers arrived for that particular shift.  That the briefings took five to fifteen minutes does not allow the Court to infer how many minutes were unpaid.  Furthermore, her testimony fails to establish how many years she was allegedly not compensated for arriving early.  Vogelsang-Wolf arrived early to work "in the beginning" of her employment, but not in the later years.  Vogelsang-Wolf Depo. at 79:20-24 (Vogelsang-Wolf). See MSJ ¶ 17, at 4.  She does not present evidence of what years she arrived early and whether she did so regularly.  Without this information, the Court cannot draw a just and reasonable inference of her allegedly uncompensated time.

Furthermore, she does not show that she performed any other uncompensated work besides arriving to work a few minutes early for the briefings.  When she was required to stay past her shift, she "would go right back in and sign in" on the time sheet.  Vogelsang-Wolf Depo.

at 69:14-15 (Vogelsang-Wolf).  She states that she expected to be compensated for that time. 71:23-24 (Padilla, Vogelsang-Wolf).  She notes that Hidalgo County rejected her overtime requests "[m]aybe once," yet she could not remember the circumstances of that rejection or when it occurred.  Vogelsang-Wolf Depo. at 73:18 (Vogelsang-Wolf).  See MSJ ¶ 24, at 4-5; Response ¶ 24, at 4.  She stated that, if she worked extra time, she reported it and "made sure" she was compensated for it.  Vogelsang-Wolf Depo. at 79:12-16 (Padilla, Vogelsang-Wolf).  See MSJ ¶ 25, at 5; Response ¶ 25, at 4.  In sum, Vogelsang-Wolf does not present evidence from which the Court can soundly infer the amount of uncompensated overtime she allegedly performed.

**B.    HIDALGO    COUNTY    HAD    ACTUAL    OR    CONSTRUCTIVE KNOWLEDGE THAT VOGELSANG-WOLF PERFORMED OVERTIME WORK.**

Hidalgo County further argues that it is entitled to summary judgment because Vogeslang-Wolf cannot prove that Hidalgo County employers knew that she was allegedly working overtime.  Where an employer has no knowledge that its employees are working uncompensated overtime, courts may dismiss an FLSA claim on summary judgment.  See Brown v. ScriptPro LLC, 700 F.3d at 1230-32.  The question on summary judgment, however, is not whether the plaintiff will ultimately prevail on his claim.  Instead, the plaintiff must present enough evidence to support an inference that the defendant had actual or constructive knowledge that its employees performed uncompensated overtime work.  See Whitaker v. Pacific Enter. Oil Co., 956 F.2d 1170, *2 (10th Cir. 1992)(unpublished).  Hidalgo County asserts that it had no actual or constructive knowledge of Vogelsang-Wolf's alleged overtime, because she never told the Detention Center Director, Hidalgo County, or anyone else of her concerns.  See MSJ at 20. Vogelsang-Wolf presents evidence to the contrary.  She argues that Hidalgo County was aware that employees were performing the pre- and post-shift work, because Hidalgo County's policies

- 30 -

required it.  <u>See</u> Response at 13-14.  She suggests that Hidalgo County knew because its "briefings occurred every day" and because the Detention Center Post Order required those briefings.  Response at 14.  Ward also admitted to being aware of the policy requirement.  <u>See</u> Response ¶ 5, at 5; <u>id.</u> at 14; Reply ¶ 5, at 6.

Language in policies and procedures that require employees to work certain times may allow a reasonably jury to find that an employer knew its employees performed uncompensated work.  <u>See</u> <u>Brubach v. City of Albuquerque</u>, 893 F. Supp. 2d at 1227 (finding that, because the employer knew of its policy requiring officers to arrive five minutes early and the employer disciplined them for failing to arrive early, a reasonable jury could "conclude that Defendant had constructive notice that security officers may have been arriving early").  Here, Hidalgo County was aware that its policies encouraged employees to arrive early.  Accordingly, the Plaintiffs have submitted enough evidence to show that Hidalgo County could have known that its employees performed uncompensated pre- and post-shift work.

## C. THE FLSA REQUIRES HIDALGO COUNTY TO COMPENSATE VOGELSANG-WOLF FOR ONLY SOME OF HER PRE-SHIFT ACTIVITIES.

Vogelsang-Wolf asserts that Hidalgo County required her to arrive to work early, to stay late to perform certain tasks, and to take part in a pre-shift briefing.  Supreme Court precedent establishes that the FLSA may require employers to compensate employees for certain pre- and post-shift work when the work is integral and indispensable to the employee's principal activities.  Vogelsang-Wolf does not present evidence that all of her pre- and post-shift work meets this standard.  Accordingly, even if the Court were able to draw a reasonable inference of the number of hours she allegedly worked, the FLSA does not, on the undisputed facts, require Hidalgo County to compensate employees for time spent reading post orders and inspecting

equipment.  Hidalgo County is entitled to judgment as a matter of law regarding this time. Because Vogelsang-Wolf demonstrates that her pre-shift briefings are integral and indispensable to her principal activities, the FLSA may require Hidalgo County to compensate her for pre-shift briefings.

Vogelsang-Wolf asserts that before beginning her principal work she must: (i) read post orders; (ii) inspect all equipment; and (iii) attend a briefing.  See Response at 8.  The pre-shift briefing typically takes between two and fifteen minutes.  See MSJ ¶ 15, at 3-4; Response ¶ 15, at 3.  This pre- and post-shift work is compensable as a principal activity only if Vogelsang-Wolf is (i) "employed to perform" that activity, and (ii) it is integral and indispensable to her principal activity.  Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519.  Here, Hidalgo County employed Vogelsang-Wolf to "participate in the day-to-day operations of the jail."  Job Description for Detention Officer, Hidalgo County at 1 (filed September 30, 2014)(Doc. 33-3)("Job Description").  Vogelsang-Wolf's duties included "supervisory duties relating to the entry, incarceration, safety and release of persons committed to the Detention Center."  MSJ ¶ 3, at 2 (setting forth this fact).  See Response ¶ 3, at 1.

Vogelsang-Wolf's only argument why Hidalgo County must compensate her for pre-shift tasks is that Hidalgo County required them.  See Reply at 9 ("Brubach tells us that a Plaintiff meets his or her burden of proof in an FLSA claim by showing that the hours worked were required by the terms of employment.").  Vogelsang-Wolf misses the Supreme Court's clear statement that whether the employer requires certain work does not determine whether the work is compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519 ("If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address.");

Gorman v. Consol. Edison Corp., 488 F.3d 586, 594 (2d Cir. 2007)("The donning and doffing of generic protective gear is not rendered integral by being required by the employer.").[8] Consequently, that Hidalgo County requires any of this pre-shift work does not alone make it necessary that Hidalgo County compensate Vogelsang-Wolf for that work.

No written policy requires officers to arrive before their shifts. See Response at 5. Employees discovered that they should arrive early for briefings by "word of mouth" and "common knowledge." Response ¶ 1, at 5. See Reply ¶ 1, at 5. Moreover, that the pre-shift briefings benefit the employer is not dispositive. See Dinkel v. MedStar Health Inc., 2015 WL 1735078, at *3 (D.D.C. 2015)(Kollar-Kotelly, J.)(concluding that maintaining sanitary work uniforms, as the employer required, did not constitute an integral and indispensable activity, even though "removing infectious pathogens from their uniforms made their jobs safer and more efficient by minimizing the spread of hospital-acquired infections to patients"). The test is whether the pre- and post-shift work is: (i) integral and indispensable to Vogelsang-Wolf's principal activities; and (ii) part of the "productive work that the employee is *employed to perform*." Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519 (emphasis in original). See IBP, Inc. v. Alvarez, 546 U.S. at 24; Smith v. Aztec Well Servicing Co., 426 F.3d at 1289.

---

[8]Vogelsang-Wolf argues that Brubach v. City of Albuquerque, 893 F. Supp. at 1224, requires the Court to find her pre-shift work compensable. In Brubach v. City of Albuquerque, the City of Albuquerque required employees to attend briefing sessions before work. The Honorable Martha Vazquez, United States District Judge, concluded that, because these briefings were mandatory, they were integral and indispensable, and not compensable. See 893 F. Supp. at 1229. Judge Vazquez decided Brubach v. City of Albuquerque before the Supreme Court's recent decision in Integrity Staffing Solutions, Inc. v. Busk, which altered the analysis for determining whether certain tasks are compensable. Before Integrity Staffing Solutions, Inc. v. Busk, courts frequently held that, when employers required an activity, it was integral and indispensable. In Integrity Staffing Solutions, Inc. v. Busk, the Supreme Court clarified the meaning of "integral and indispensable." Importantly, the Supreme Court stated that a required activity is not necessarily compensable. See 135 S. Ct. at 519.

Reading post orders and checking equipment are preliminary to Vogelsang-Wolf's "productive work." Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519. Hidalgo County does not pay its officers to read post orders and ensure that equipment is there. These activities merely prepare them to perform their duties. They do not constitute "the actual 'work of consequence performed for an employer,'" and are more like "the ingress and egress process." Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 520 (quoting 29 C.F.R. § 790.8(a)). See Reich v. New York City Transit Auth., 45 F.3d 646, 651 (2d Cir. 1995)(observing that the Portal-to-Portal Act amendments exempt such "trivial, non-onerous aspects of preliminary preparation" from "work time" under the FLSA). Indeed, officers frequently failed to arrive early to perform this work. See Vogelsang-Wolf Depo. at 79:23-24. Moreover, the Tenth Circuit has held that pre- and post-shift activities that can be accomplished with minimal effort and time are non-compensable. See Smith v. Aztec Well Servicing Co., 462 F.3d at 1289 (holding that preliminary activities that employees can perform quickly and that require little concentration are simply a prerequisite for the job -- not integral and indispensable to their principal activities); Gorman v. Consol. Edison Corp., 488 F.3d 586, 594-595 (2d Cir. 2007)(finding that the donning and doffing of helmets, safety glasses, and steel-toed boots were "relatively effortless," preliminary tasks that were not integral to employees' principal work activities, and that the employer did not need to compensate the employees for the work); Albrecht v. Wackenhut Corp., 379 F. App'x 65, 67 (2d Cir. 2010)(finding that the employer did not need to compensate employees for donning and doffing uniforms and equipment because it was a preliminary or postliminary activity). Because checking equipment and reading post orders involved little effort and time, and were not part of the productive work that Hidalgo

County employed them to perform, Hidalgo County does not need to compensate Vogelsang-Wolf for the work.

Finally, Vogelsang-Wolf asserts that she had to engage in pre- and post-shift briefings with incoming and outgoing officers. Courts have held that mandatory pre-shift briefings can form the basis for FLSA overtime violations. See Brubach v. City of Albuquerque, 893 F. Supp. 2d at 1225. After the Supreme Court's decision in Integrity Staffing Solutions, Inc. v. Busk, however, Vogelsang-Wolf must show more than that the briefings are helpful or required. They must instead be integral and indispensable -- meaning that she could not perform her job without them. See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518.

Vogelsang-Wolf has tendered enough evidence to suggest that she could not perform her job without these pre-shift briefings. Not only were they required, but they occurred before every shift. See Response ¶ 1, at 5; Reply ¶ 1, at 5. Officers could not begin their productive work without participating in the briefing. They provided important information on how to maintain the Detention Center's safety. Hidalgo County produced no evidence to suggest that officers could have obtained this information in another way. Moreover, the briefings frequently occurred during the officer's shift, meaning that they were paid to participate in the briefings. See MSJ ¶¶ 14-15, at 3-4; Response ¶¶ 14-15, at 3. Importantly, that officers did not begin the briefings until their shift began -- and were therefore paid for all or at least a portion of the briefings -- also demonstrates that only a few minutes at most were uncompensated. In sum, the pre-shift briefings were integral and indispensable to the officer's principal tasks.

The post-shift briefings, however, are not compensable. Even if the post-shift briefings and tasks might enable officers to perform their job more efficiently, thus benefitting the employer, these tasks were not integral and indispensable in the way that the Supreme Court

interprets the phrase in <u>Integrity Staffing Solutions, Inc. v. Busk</u>.  135 S. Ct. at 519 (finding that mandatory pre-shift activities like changing clothes and showering were indispensable when working with toxic chemicals, because it would be effectively impossible for the employees to do their job without it).  An "activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safety and effectively."  <u>Integrity Staffing Solutions, Inc. v. Busk</u>, 135 S. Ct. at 520 (Sotomayor, J., concurring).

Vogelsang-Wolf and fellow officers could perform their principal activities without participating in the post-shift briefings.  She states that detention officers frequently skipped the post-shift briefings.  <u>See</u> Vogelsang-Wolf Depo. at 47:2-9 (Vogelsang-Wolf)(describing how detention officers consistently leave before participating in the post-shift briefings); <u>id.</u> at 49:2-7 (describing how officers could leave without participating in the briefings).  Similarly, she was unaware of Hidalgo County disciplining any officers for not arriving early for pre-shift work. <u>See</u> Response ¶ 16, at 3; Vogelsang-Wolf Depo. at 80:7-11 (Padilla, Vogelsang-Wolf).[9]  She also states that some officers simply failed to write in the pass-down logs.  <u>See</u> Vogelsang-Wolf Depo. at 38:23-24 (Vogelsang-Wolf)(agreeing that the logs would not be helpful in knowing when officers arrive for a shift, because so many officers fail to sign them).  In sum, Vogelsang-Wolf's evidence demonstrates that officers could adequately perform their work without arriving early or staying late to perform additional tasks, including post-shift briefings.

As to the pre-shift briefings, Vogelsang-Wolf presented enough evidence to demonstrate that Hidalgo County should compensate her for them.  On the other hand, that Vogelsang-Wolf

---

[9]Vogelsang-Wolf later testified that if an officer arrives late, he can be disciplined.  <u>See</u> Vogelsang-Wolf Depo. at 51:18-20 (Vogelsang-Wolf).  She did not, however, state that they could be disciplined for failing to arrive early for the pre-shift briefing and other tasks.

could adequately perform her principal activities without performing the other pre- and post-shift work demonstrates that it is not integral and indispensable.  See Dinkel v. MedStar Health Inc., 2015 WL 1735078, at *5 ("Plaintiffs argue that their uniform maintenance activities were important to the hospital's infection control policy, but they do not argue and they cannot show that their jobs would be so unsafe as to be effectively impossible to carry out their jobs without their uniform maintenance activities.").  There is therefore no genuine issue of material fact in dispute whether Hidalgo County was required to compensate the remaining pre-shift work and post-shift briefings.   The pre-shift work and post-shift briefings are not integral and indispensable, and therefore Hidalgo County need not compensate Vogelsang-Wolf under the FLSA for these tasks.

**D.    THE FLSA DOES NOT REQUIRE HIDALGO COUNTY TO COMPENSATE VOGELSANG-WOLF FOR HER OVERTIME BECAUSE THE TASKS INVOLVED ARE DE MINIMIS.**

Even if Vogelsang-Wolf could produce evidence of the number of hours she worked, the work was de minimis, and, therefore, the FLSA does not require Hidalgo County to compensate her for these tasks.  The de minimis rule acknowledges that, when employees work only minutes beyond their scheduled working hours, the employer may disregard "such trifles" and compute an employee's workweek "in light of the realities of the industrial world."  Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 692.  The question whether the de minimis exception applies is separate and distinct from whether the FLSA covers the activity.  See Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 692; Reich v. Monfort, Inc., 144 F.3d 1329, 1333 (10th Cir. 1998); 29 C.F.R. § 785.47.  Thus, even if Vogelsang-Wolf's pre- and post-shift work was integral and indispensable to her principal activities, it can nonetheless be non-compensable as de minimis.

Vogelsang-Wolf cites Brubach v. City of Albuquerque as standing for the proposition that, when an employer requires pre-shift briefings, they constitute part of an employee's "fixed or regular working time," and are "not subject to the de minimis exception." 893 F. Supp. 2d at 1235. Brubach v. City of Albuquerque, however, hinged on the determination that, if an employer requires an employee to work certain hours, those hours constitute compensable "work." 893 F. Supp. 2d at 1230-31. As explained above, the Supreme Court rejected this reasoning two years later in Integrity Staffing Solutions, Inc. v. Busk. That the employer requires pre-shift work does not make it "work" for which the employer, under the FLSA, must compensate the employee; that the FLSA might require the employer to compensate employees for their work does not preclude it from being de minimis. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 692; Reich v. Monfort, Inc., 144 F.3d 1329, 1333 (10th Cir. 1998); Singh v. City of New York, 524 F.3d 361, 370 (2d Cir. 2008)(finding that the de minimis doctrine permits employers to disregard otherwise compensable work "[w]hen the matter in issue concerns only a few seconds or minutes of work"); Reich v. New York City Transit Auth., 45 F.3d 646, 652-53 (2d Cir. 1995)(describing the policy to disregard otherwise compensable activities that involve minimal time and effort). Consequently, that an employer requires pre-shift briefings does not make them part of an employee's fixed or regular working time, and they may be de minimis.

The Tenth Circuit applies the test that the United States Court of Appeals for the Ninth Circuit adopted in Lindow v. United States to determine whether pre- or post-shift tasks are de minimis. See Reich v. Monfort, Inc., 144 F.3d at 1333. Courts consider: (i) the practical administrative difficulty of recording the additional time; (ii) the aggregate amount of compensable time; and (iii) the regularity of the additional work. See Lindow v. United States, 738 F.2d at 1063. For example, in Lindow v. United States, the amount of time employees spent

performing pre-shift work varied.  See 738 F.2d at 1063-64.  The Ninth Circuit held that, even though the plaintiffs' aggregate overtime was substantial, the claim was "de minimis because of the administrative difficulty in recording the time and the irregularity of the additional pre-shift work."  738 F.2d at 1064.

As to the amount of time, some briefings took less than five minutes, while others took between five to fifteen minutes.  See MSJ ¶ 15, at 3-4; Response ¶ 15, at 3; Vogelsang-Wolf Depo. at 67:16-18 (Vogelsang-Wolf).  Had the officers been required to arrive fifteen minutes early without pay, this time would not likely be de minimis.  The issue here, however, is that the officers were paid for these briefing periods once their shift officially started.  See MSJ ¶¶ 14-15, at 3-4; Response ¶¶ 14-15, at 3; Vogelsang-Wolf Depo. at 67:1-7 (Vogelsang-Wolf). Importantly, the briefings did not begin until around two to five minutes before the shift began, or until all officers arrived.  See Vogelsang-Wolf Depo. at 65:25-66:2 (Vogelsang-Wolf). Officers would not start briefing fifteen minutes before their shift. See Vogelsang-Wolf Depo. at 65:25-66:2 (Vogelsang-Wolf).  Accordingly, the time period in which the officers participated in pre-shift briefings for which they were not paid was roughly a few minutes, which is a de minimis amount.

Finally, the pre-shift work was not regular.  Many officers did not arrive early to write in the pass-down logs.   See Response ¶ 12, at 2; Vogelsang-Wolf Depo. at 38:15-39:22 (Vogelsang-Wolf, Padilla)(describing how officers routinely refused or forgot to fill out the logs).  In fact, Vogelsang-Wolf arrived early only in the beginning of her employment with Hidalgo County.  See MSJ ¶ 17, at 4; Vogelsang-Wolf Depo. at 79:21-80:6 (Padilla, Vogelsang-Wolf); id. at 155:5-7.  This situation is unlike the circumstances in Brubach v. City of Albuquerque, where the City of Albuquerque not only required officers to arrive ten minutes

early for briefings by written policy, but punished and threatened officers who failed to arrive early.  See 893 F. Supp. 2d at 1230-31.  Here, the briefings often occurred either when the officers' shift began or two to five minutes before.  When the briefings began depended on numerous factors, including whether all officers had arrived and when the particular supervisor in charge chose to begin.  Because of the irregularity, the short duration, and the administrative difficulty of recording the time, the Court concludes that the pre- and post-shift work is de minimis.  There is no genuine issue of material fact in dispute.  Reading the facts in the light most favorable to Vogelsang-Wolf, the pre- and post-shift work is de minimis.

E.    **HIDALGO COUNTY DOES NOT NEED TO COMPENSATE VOGELSANG-WOLF FOR HER ALLEGED ON-CALL WORK.**

Time spent on call may be "working time" within the FLSA's compensation provisions if the time is spent "predominantly for the employer's benefit."  Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944).  See Armitage v. City of Emporia, Kan., 982 F.2d 430, 432 (10th Cir. 1992).  United States Department of Labor regulations distinguish between "on-duty" and "off-duty" on-call time.  "On-duty" on-call time occurs when "the employee is engaged to wait."  29 C.F.R. § 785.15.  "Off-duty" on-call time involves time periods "which are long enough to enable him to use the time effectively for his own purposes."  29 C.F.R. § 785.16.  Where on-call employees are "not confined to their homes or to any particular place, but may come and go as they please, provided that they leave word where they may be reached, the hours spent 'on call' are not considered as hours worked."  29 C.F.R. § 778.223.  Accordingly, employers must compensate employees for on-call time only if employees cannot pursue personal activities because on-call restrictions limit their ability to pursue personal activities.  See Norton v. Worthen Van Serv., Inc., 839 F.2d 653, 655 (10th Cir. 1988).

For the FLSA to require employers to compensate employees for certain tasks, the restriction must be "so burdensome as to render it time predominantly spent for the benefit of the employer."  Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993).  Courts consider various factors in determining whether the restriction meets this test: (i) the frequency of calls, (ii) the response time required; (iii) the amount of time spent responding to calls; (iv) the geographical restrictions on the employee; (v) and, most importantly, the degree to which the employee could engage in personal activity.  See Norton v. Worthen Van Serv., Inc., 839 F.2d at 654-55.  Prohibitions on drinking alcohol and geographic restrictions are not enough alone to make the on-call time compensable.  See Armitage v. City of Emporia, Kan., 982 F.2d at 432 (finding that the plaintiffs' on-call time was not compensable, even though they had to remain sober and be able to report for duty within twenty minutes).

For example, in Sarmiento v. City and County of Denver, 82 F.3d 426 (10th Cir. 1996)(unpublished), the Tenth Circuit found the employer did not need to compensate the plaintiff for his on-call time, even though he "felt constrained in what he did and his activities were interrupted by call-backs" that occurred almost on a nightly basis.  82 F.3d at *2, *5.  He was told to stay within a certain area so that he could not participate in all activities he would have enjoyed.  Moreover, the employer required him to respond "as soon as possible," and to work "anywhere from 15 minutes to 2-3 hours and sometimes longer."  82 F.3d 426, at *5.  Despite these restrictions, the Tenth Circuit held that these "restrictions . . . do not show that he was 'engaged to wait,' but rather that he 'waited to be engaged.'"  82 F.3d 426, at *2.  Accordingly, the employer did not, as a matter of law, need to compensate the employee for his on-call time.

The issue how Vogelsang-Wolf spends her on-call time is a question of fact that the Court cannot resolve on summary judgment.  See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  On the other hand, whether Hidalgo County must compensate Vogelsang-Wolf for her undisputed activities as on-call time under the FLSA is a question of law, "which can properly be resolved on summary judgment."  Renfro v. City of Emporia, 948 F.2d 1529, 1536 (10th Cir. 1991)(granting summary judgment by relying on undisputed facts).  See Berry v. Cnty. of Sonoma, 30 F.3d 1174, 1180 (9th Cir. 1994)(finding that whether "limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable overtime under the FLSA is a question of law . . . .");  Sarmiento v. City and Cnty. of Denver, 82 F.3d 426, at *2.  Here, the facts are undisputed.

Hidalgo County put few restrictions on Vogelsang-Wolf during the four times she was on call.  The only restrictions were that she could not leave town, could not drink alcohol, and had to be available by telephone.  See MSJ ¶ 27, at 5; Response ¶ 27, at 4; Vogelsang-Wolf Depo. at 100:23-101:4 (Padilla, Vogelsang-Wolf).  In the five years that she was on call, she had to return to work around five to ten times.  See MSJ ¶ 32, at 6; Response ¶ 32, at 4; Vogelsang-Wolf Depo. at 69:10-11 (Vogelsang-Wolf).  She did not have to remain at her employer's premises and was able to spend much of her time engaging in personal activities.   See MSJ ¶ 28, at 5; Response ¶ 28, at 4.  Notably, she was on call with other officers, so if she was unavailable, the Detention Center would call another officer.  See Vogelsang-Wolf Depo. at 117:20-24 (Padilla, Vogelsang-Wolf).  She was not disciplined for being unavailable.  See MSJ ¶ 31, at 5; Response ¶ 31, at 4; Vogelsang-Wolf Depo. at 118: 12-21 (Vogelsang-Wolf).

Although Vogelsang-Wolf believed that her on-call time limited her activities, she was able to leave her employer's premises and engage in her own personal activities.  See Armitage,

982 F.2d at 432.  Taking the undisputed facts, the FLSA does not require Hidalgo County, as a matter of law, to compensate Vogelsang-Wolf for her alleged on-call time.  See Gilligan v. City of Emporia, 986 F.2d at 411 (dismissing the plaintiffs' on-call time claims on summary judgment even though the employers required the plaintiff employees to respond to calls within one hour, prohibited alcohol consumption, and required employees to stay within pager range, which limited their activities).

F. **VOGELSANG-WOLF HAS NO CLAIMS UNDER THE FLSA FOR ROUNDING TIME.**

Vogelsang-Wolf alleged that the time she reported on her time sheets was rounded off to the "nearest quarter" of an hour.  Vogelsang-Wolf Depo. at 145:19-146:18 (Vogelsang-Wolf).  "Rounding" is a generally accepted practice under the FLSA.  Specifically, the Department of Labor regulations, adopted pursuant to the FLSA, permit employers to use time rounding policies:

> (b) "Rounding" practices.  It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour.  Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.  For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b).  Employers may therefore lawfully use rounding policies to record and compensate time, as long as the policy does not "consistently result[] in a failure to pay employees for time worked."  Sloan v. Renzenberger, Inc., 2011 WL 1457368, at *3 (D. Kan. 2011).

Here, Hidalgo County's rounding policy does not violate the FLSA, because there is no evidence that the policy resulted in a failure to compensate Vogelsang-Wolf for time worked.

The undisputed evidence shows that the rounding policy favored neither over- nor underpayment.  For instance, on days Vogelsang-Wolf worked until 6:55 p.m., Hidalgo County would round her work time to 7:00 p.m. -- the nearest quarter of an hour -- thereby giving her an additional five minutes.

Vogelsang-Wolf does not contend that Hidalgo County's policy is unfair.  She does not address it at all in her Response and produces no evidence suggesting that Hidalgo County implemented its rounding policy in an unfair manner.  Accordingly, no factual dispute exists, and the Court grants summary judgment in favor of Hidalgo County.  See East v. Bullock's, Inc., 34 F. Supp. 2d 1176, 1184 (D. Ariz. 1998)(granting summary judgment in employer's favor where the employer's rounding system did not credit employees for all the time they worked, but it also credited them for time worked); Gillings v. Time Warner Cable LLC, 583 F. App'x 712, 716 (9th Cir. 2014)(unpublished)(granting summary judgment when the plaintiffs produced no evidence that the employer's rounding policy caused two employees to lose wages.

## II.   VOGELSANG-WOLF CANNOT PURSUE HER STATE LAW CLAIMS IN FEDERAL COURT.

Hidalgo County also moves for summary judgment on all of Vogelsang-Wolf's state law claims.   The Court dismisses her federal claims and declines to exercise supplemental jurisdiction over her state law claims.[10]   It therefore dismisses her state law claims without

---

[10]Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  The Tenth Circuit reviews a district court's decision not to exercise jurisdiction for abuse of discretion.  See Nielander v. Bd. Of Cnty. Comm'rs, 582 F.3d 1155, 1172 (10th Cir. 2009).  The Tenth Circuit has held: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(Ebel, J.).  See United Mine Workers of Amer. v. Gibbs, 383 U.S. 715, 726 (1966)("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

prejudice.  Although the Court does not rule on Vogelsang-Wolf's state law claims, because it spent so much time analyzing them when it wrote the MOO granting conditional certification, the Court gives the state court and the parties the benefit of its work.  The Court has already concluded that Vogelsang-Wolf is unlikely to prevail on both her state statutory claim and her breach of contract claim.

### A.   VOGELSANG-WOLF IS UNLIKELY TO BE ABLE TO USE NMSA 50-4-2(b) TO PURSUE STRAIGHT TIME CLAIMS, OVERTIME, AND MINIMUM WAGES.

Vogelsang-Wolf's state law claims are for the same behavior that allegedly constitutes the FLSA violations.  Specifically, Count One alleges a NMMWA claim for unpaid wages in violation of unspecified portions of NMSA §§ 50-4-1–50-4-30.  See Complaint, ¶ 21, at 4.  The NMMWA provides that "[a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours."  § 50-4-22(D) NMSA. The NMMWA exempts, however, public employers like Hidalgo County from the overtime and minimum wage provisions.  See §§ 50-4-21(B), (C)(3) NMSA.  See Brubach v. City of Albuquerque, 893 F. Supp. 2d at 1237 (stating that "the overtime provisions in the New Mexico statute do not apply to public employers such as the City").  After conceding this point, see Response at 18, the Plaintiffs for the first time specifically allege violations of § 50-4-2(b) to support Count One.  See Response to MSJ at 18.

Section 50-4-2(b), however, governs the timely payment of wages.  See, e.g., Rainaldi v. City of Albuquerque, 2014-NMCA-112, ¶ 19, 338 P.3d 94, 96 (Hanisee, J.)(referring to § 50-4-2 as a "statutorily mandated compensation schedule").  In Rainaldi v. City of Albuquerque, the

Court of Appeals of New Mexico found that § 50-4-2 imposes two distinct wage payment requirements:

> (1) that employers "shall designate regular pay days, not more that sixteen days apart, as days fixed for the payment of wages to all employees paid in [the] state[,]" and (2) that employers "shall pay for services rendered from the first to the fifteenth days . . . by the twenty-fifth day of the month during which services are rendered, and for all services rendered from the sixteenth to the last day of the month . . . by the tenth day of the succeeding month."

2014-NMCA-112, ¶ 6.  The Court of Appeals of New Mexico stated that this provision requires the employer to "pay its employees within ten days of the end of a particular pay period" for a "service rendered by the employee, determined by the City to be compensable." Rainaldi v. City of Albuquerque, 2014-NMCA-112, ¶ 22 (emphasis added).

Notably, § 50-4-2 does not provide a cause of action to sue for wages of disputed compensability.  "When a state wage-payment law applies, it requires timely payment of undisputed wages. . . .  [T]he wage-payment law may not apply because . . . the payments sought are not 'wages' covered by the law."  RESTATEMENT OF EMPLOYMENT LAW § 3.01 (Proposed Final Draft 2014)(referencing § 50-4-2 when stating that laws governing timely payment of wages "regulate the timing of payment of wages and often require payment of the undisputed part of wages.")(emphasis added).  In fact, there is no case law authorizing a private cause of action under § 50-4-2(b) for wages of disputed compensability.  New Mexico labor statutes provide mechanisms to sue for wages in dispute, unpaid overtime, and minimum wages. Specifically, § 50-4-26(C) provides that employers "shall be liable to employees affected in the amount of their unpaid or underpaid minimum wages."  N.M. Stat. Ann. § 50-4-26(C).  Then, § 50-4-26(D) provides a cause of action to recover those unpaid wages:

> An action to recover such liability may be maintained . . . by any one or more employees for and on behalf of the employee or employees and for other

- 46 -

employees similarly situated, or such employee or employees may designate an
agent or representative to maintain such action on behalf of all employees
similarly situated.

Section 50-4-26(D) NMSA.  As stated above, however, the NMMWA exempts public employers
like Hidalgo County from these provisions.  See N.M. Stat. Ann. §§ 50-4-21(B), (C)(3).

Second, § 50-4-7 provides a specific procedure for recovering wages in dispute from
public employers.  See N.M. Stat. Ann. § 50-4-7.  Finally, § 50-4-17 subjects public employers
to fines and penalties for failing to comply with New Mexico's wage and hour provisions.  That
the state wage and hour laws provide these mechanisms demonstrates that the New Mexico
Legislature likely did not intend to provide a private cause of action to recover wages in § 50-4-
2(b).  To use § 50-4-2, which requires employers to pay employees on designated semimonthly
or monthly pay days, to sue a public employer for wages of disputed compensability would
circumvent the NMMWA's remedial scheme.  Because the Plaintiffs likely cannot maintain a
suit for the payment of ordinary wages under New Mexico wage-and-hour laws against Hidalgo
County, the claim is likely to fail as a matter of law.

**B.  VOGELSANG-WOLF LIKELY CANNOT ASSERT BREACH OF AN
IMPLIED CONTRACT WHEN FEDERAL AND STATE LAWS
ALREADY REQUIRE THE DEFENDANT TO COMPLY.**

Vogelsang-Wolf's next state law claim, Count Three, asserts a claim for breach of
contract.  She alleges that Hidalgo County was a party to an implied employment contract which
required it to pay for "hours worked and overtime."  Complaint, ¶ 29, at 5.  She argues that
Hidalgo County's polies and handbooks form the basis of this contract.  See Response to MSJ at
19.  While an employee handbook or other policies can form the basis of an implied contract, see
Lopez v. American Baler Co., 2014 WL 1285448, *20 (D.N.M. March 27, 2014)(Browning, J.),
the Supreme Court of New Mexico has stated that "an agreement to do what one is already

legally bound to do is not sufficient consideration for the promise to another." Salazar v. City of Albuquerque, 2013 WL 5554185, at *46 (citing to Bank of Santa Fe v. Biava, 1990-NMSC-023, ¶¶ 2-7).

In Salazar v. City of Albuquerque, the Court held that the plaintiff could not enforce the City Charter as a condition of his employment contract.  The Court recognized that a promise which supports an implied contract could be found in written representations like an employer's policies or handbooks.  See 2013 WL 5554185, at *46.  Nonetheless, "[c]ourts have held that an alleged implied contract that merely restates the law does not create an implied contract."  2013 WL 5554185, at *46 (citing Peralta v. Cendant Corp., 123 F. Supp. 2d 65, 83 (D. Conn. 2000)(Arterton, J.)("The language of the anti-harassment policy that plaintiff urges as the basis of his implied contract claim does not indicate that defendant is undertaking any contractual obligations towards the plaintiff; rather, it obliges the Defendant to comply with federal and state anti-discrimination laws.")).

Promises in Hidalgo County's policies and procedures are general statements of adherence to federal and state laws; thus, "standing alone they do not create a separate and independent contractual obligation." Peralta v. Cendant Corp., 123 F. Supp.2d at 65.  See Byra–Grzegorczyk v. Bristol–Myers Squibb Co., 572 F. Supp. 2d 233, 254 (D. Conn. 2008)(Kravitz, J.)(recognizing that an "anti-discrimination policy" does not indicate that an employer is undertaking any contractual obligations towards the employee; rather, it requires the employer "to comply with federal and state anti-discrimination laws"); Belgrave v. City of N.Y., 1999 WL 692034, *45 (E.D.N.Y. 1999)(Gleeson, J.)(dismissing the plaintiff's breach-of-contract claim where employee alleged that employer failed to follow its procedures for providing equal opportunity to employees); Mutua v. Tex. Roadhouse Mgmt. Corp., 2010 WL 4683859, at *14-

15 (D.S.D. Nov. 10, 2010)(Schreier, J.)(granting summary judgment on a breach-of-contract claim seeking to enforce the anti-discrimination provisions in the employer's employee handbook, because the employer already must abide by Title VII and a promise to perform a legal duty is not consideration for a return promise); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998)(Jones, J.)(stating that a provision in the code of conduct requiring that all students receive fair and equal treatment is "merely a general statement of adherence by [the defendant] to existing anti-discrimination laws[;][i]t does not create a separate and independent contractual obligation")(citation omitted).

The Court in Clayton v. Vanguard Car Rental U.S.A., Inc., 761 F. Supp. 2d 1210 (D.N.M. 2010)(Browning, J.), stated its belief that "the Supreme Court of New Mexico would not vary from this body of law, because the Supreme Court has recognized that 'an agreement to do what one is already legally bound to do is not sufficient consideration for the promise to another.'" 761 F. Supp. 2d at1280 (citing Bank of Santa Fe v. Biava, 1990-NMSC-023, ¶¶ 2-7). Furthermore, even if Hidalgo County's policies and procedures could constitute an implied contract, Vogelsang-Wolf has not established that those policies created an implied contract. The Plaintiffs allege that Hidalgo County is already obligated to pay its employees for "hours worked and overtime" under the FLSA and New Mexico statutory law. See Complaint ¶ 21, at 4; id. ¶ 24, at 5. Because Hidalgo County already had a duty to pay Vogelsang-Wolf under the FLSA and New Mexico statutory law, representations in the employee handbook or other policies and procedures cannot form the basis of an implied contract. The Court therefore grants the MSJ as to Count Three.

## C.     VOGELSANG-WOLF     CAN     LIKELY     PURSUE     HER     UNJUST ENRICHMENT CLAIM.

Vogelsang-Wolf's final state law claim, Count Four, is for unjust enrichment.   She alleges that Hidalgo County "failed to pay Plaintiffs and others for all hours worked."  Complaint ¶ 34, at 6.  Vogelsang-Wolf has statutory remedies available under the FLSA and New Mexico statutory law to recover for Hidalgo County's alleged failure to compensate.  The Supreme Court of New Mexico has stated that "[t]he general equity jurisdiction of the trial court is not available . . . because appellee in fact had an adequate remedy at law."  Gen. Tel. Co. of Sw. v. State Tax Comm'n, 1962-NMSC-005, 69 N.M. 403, 408, 367 P.2d 711, 715.  See Sims v. Sims, 1996-NMSC-078, 122 N.M. 618, 624, 930 P.2d 153, 159 (stating that "equity will not act if there is a complete and adequate remedy at law"); Meyer v. Christie, 634 F.3d 1152, 1162 (10th Cir. 2011)(McKay, J.)(prohibiting the plaintiffs from pursuing their unjust enrichment claim unless they elect not to recover damages on their legal claims); Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1117 (10th Cir. 2005)(Murphy, J.)(finding that an equitable claim for unjust enrichment fails when the parties had remedies available at law under their contract); Strom v. Goldman, Sachs & Co., 202 F.3d 138, 144 n.6 (2d Cir. 1999)(Kaplan, J.)(finding that, when there is an adequate remedy at law, a court will not permit a claim in equity); Austin v. N. Am. Forest Products, 656 F.2d 1076, 1088-89 (5th Cir. 1981)(Johnson, J.)(finding that, when an adequate remedy at law is available, "the court may not resort to principles of equity")..

New Mexico law disfavors equitable actions when the plaintiffs have legal remedies available.  See Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1116-17 (discussing the preference for legal remedies over unjust enrichment claims); Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d 1244, 1271-72 (D.N.M. 2014)(Browning, J.)(finding that the Tenth Circuit's interpretation of New Mexico law, which binds the Court, "expresses a reticence to

permit an unjust enrichment claim to proceed when there are contractual remedies"). Whether the Plaintiffs may pursue an equitable remedy when federal and state statutes provide legal remedies is a state law issue. When the Supreme Court of New Mexico has not yet decided an issue, the Court's task is to predict how the Supreme Court of New Mexico would decide the issue. See Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)("Ultimately, however, the Court's task is to predict what the state supreme court would do.")(citations omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)("The Court's task is to divine, as much as possible, what the Supreme Court of New Mexico would do if the legal question was presented to it."). The Tenth Circuit's interpretation of New Mexico law constrains the Court's interpretation of New Mexico law. See Abraham v. WPX Energy Prod., 20 F. Supp. 3d at 1272.

When state and federal labor laws provide a means to recover unpaid compensation, other courts have refused to allow a plaintiff's unjust enrichment claim to proceed. See Garcia v. Tyson Foods, Inc., 766 F. Supp. 2d 1167, 1188 (D. Kan. 2011)(Lungstrum, J.)(granting summary judgment on unjust enrichment claim as duplicative of wage claims under state law)(citing Clougher v. Home Depot U.S.A., Inc., 696 F. Supp. 2d 285, 295 (E.D.N.Y. 2010)(Mauskopf, J.)(dismissing quantum meruit claims as duplicative of state statutory claim in wage and hour context)); Perry v. Upper Deck Co., 2007 WL 1449797, at *3 (S.D. Cal. May 11, 2007)(Burns, J.)(granting summary judgment on unjust enrichment claim where remedies were available under California Labor Code, Cal. Labor Code §§1 - 6208 (West 1989 & Supp. 2003)); Bongat v. Fairview Nursing Care Center, Inc., 341 F.Supp.2d 181, 188-89 (E.D.N.Y. 2004)(Feuerstein, J.)(dismissing quantum meruit and unjust enrichment claims in favor of statutory overtime wage law claims).

Other state courts have concluded that, the fact that the Plaintiffs may not ultimately prevail under the state and federal labor laws does not make their legal remedies inadequate. In Scarpinato v. East Hampton Point Management Corp., 2013 WL 5202656 (E.D.N.Y. 2013)(Bianco, J.), the court determined that the FLSA provided plaintiffs with a remedy for their claims that they had not been paid overtime wages. See 2013 WL 5202656, at *2. The administrative exemption to the overtime rule exempted the employer. The plaintiff's FLSA claim therefore failed. See 2013 WL 5202656, at *2. The court found that the plaintiff's claim for payment of wages under the New York Labor Law failed for the same reason -- again, the law exempted the employer. See 2013 WL 5202656, at *3. Despite that both claims failed, the court dismissed the plaintiff's unjust enrichment claim because the plaintiff had an "adequate remedy at law." 2013 WL 5202656, at *3.

The Court believes New Mexico law would arrive at a different conclusion. In Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, the Court of Appeals of New Mexico determined that the existence of a statutory remedy did not automatically foreclose an equitable remedy that addresses the same claim unless the statute "provides with express language or necessary implication" that the New Mexico Legislature intended to foreclose traditional equitable remedies. 2012-NMCA-053, ¶ 93 (citing Sims v. Sims, 1996-NMSC-078, ¶ 33), rev'd on other grounds, 2014-NMSC-033. In New Mexico, "[t]here is no requirement that the creation of a statutory remedy at law for a particular type of claim will automatically supplant an equitable remedy that addresses the same claim." Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶ 93. Similarly, the Court found that, under New Mexico law, if a plaintiff could not pursue his breach-of-contract claim for some reason, the existence of a legal remedy would not automatically bar the unjust enrichment claim. See Abraham v. WPX Energy Prod.,

20 F. Supp. 3d at 1276 (citing Danley v. City of Alamogordo, 1978-NMSC-031, 91 N.M. 520, which allowed a plaintiff to pursue an unjust enrichment claim because his contract claim was not viable).

Here, both federal and state statutes govern the parties' relationship regarding the dispute. Both statutes impose requirements on employers regarding payment to employees.  The Plaintiffs therefore have statutory remedies available to them for the wage-and-hour violations underlying their unjust enrichment claims.  Under New Mexico law, however, the Plaintiffs may pursue equitable remedies unless the statute "provides with express language or necessary implication" that the New Mexico Legislature intended to foreclose traditional equitable remedies.  Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶ 93.  Neither the FLSA nor state wage-and-hour laws provide any such indication that they foreclose equitable remedies.  Consequently, it is likely that the Plaintiffs may pursue their unjust enrichment claims.

By granting the MSJ on Vogelsang-Wolf's FLSA claims, she has only state law claims before the Court.[11]  The Court declines to exercise supplemental jurisdiction.  See Koch v. City of Del City, 660 F.3d at 1248 ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").  It therefore dismisses Vogelsang-Wolfs' state law claims without prejudice.

---

[11]The Class Action Fairness Act, 28 U.S.C. §1332 ("CAFA"), gives federal courts jurisdiction over cases where only minimal diversity exists, so long as "the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'"   Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1348 (2013)(quoting 28 U.S.C. § 1332(d)(2)). See Woods v. Standard Ins. Co., 771 F.3d 1257, 1261 (10th Cir. 2014).  The CAFA does not apply to this case, where the parties did not invoke the CAFA, or establish that: (i) the amount in controversy exceeds $5 million, or (ii) the class has more than 100 members.

**IT IS ORDERED** that the requests in Defendant Board of County Commissioners of the County of Hidalgo's Motion and Memorandum for Summary Judgment on All of Plaintiff Amanda Vogelsang-Wolf's Claims, filed November 12, 2014 (Doc. 41)("MSJ") are granted. The Court grants the motion as to Vogelsang-Wolf's federal claim -- Count Two -- for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219.  It dismisses Vogelsang-Wolf's state law claims -- Counts One, Three, and Four -- for violations of state statutory laws, breach of contract, and unjust enrichment, without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Shane C. Youtz
James A. Montalbano
Stephen Curtice
Youtz & Valdez, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Agnes F. Padilla
Felicia C. Boyd
Butt Thornton & Baehr, P.C.
Albuquerque, New Mexico

    *Attorneys for the Defendant*